MANAGEMENT COMPUTER SERVICES, INC., a Wisconsin Corporation, Plaintiff-Appellant-Cross Respondent-Petitioner,

v.

HAWKINS, ASH, BAPTIE & CO., a Wisconsin Partnership, Hawkins, Ash, Baptie, Inc., A Wisconsin Corporation, David D. Baptie, James O. Ash, R. Roy Campbell, Robert J. Daley, Walter L. Leifeld, Larry E. Vangen and Jack E. White, Defendants-Counter Claimants-Respondents-Cross Appellants,

v.

MANAGEMENT COMPUTER SERVICES, INC., Counter Defendant-Appellant-Petitioner.

Supreme Court

*No. 93–0140. Oral argument September 24, 1996.—Decided December 20, 1996.*

(Also reported in 557 N.W.2d 67.)

158

163

For the plaintiff-appellant-cross respondent-petitioner there were briefs by *Thomas D. Bell, Matthew A. Biegert* and *Doar, Drill & Skow, S.C.*, New Richmond and oral argument by *Matthew A. Biegert.*

For the defendants-counter claimants-respondents-cross appellants there was a brief by *Daniel W. Hildebrand, Steven J. Kirschner* and *DeWitt Ross & Stevens, S.C.*, Madison and oral argument by *Daniel W. Hildebrand.*

N. PATRICK CROOKS, J. Management Computer Services, Inc. (MCS) seeks review of a published decision of the court of appeals,[1] which affirmed in part and reversed in part a judgment of the circuit court for La Crosse County, the Honorable Robert W. Radcliffe presiding. In particular, the court of appeals held the following: (1) the circuit court correctly entered judg-

---

[1] *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 196 Wis. 2d 578, 539 N.W.2d 111 (Ct. App. 1995)

ment notwithstanding the verdict (JNOV) on the breach of contract claim and counterclaim, because the contract is too indefinite to enforce; (2) the circuit court erroneously changed the jury answer to reduce the conversion award against Hawkins, Ash, Baptie & Company (HABCO)[2] from $65,000 to $62,000, but correctly changed the jury answer to reduce the unjust enrichment award from $1,000,000 to $0 based on lack of sufficient evidence as to damages; (3) the circuit court erroneously ordered a new trial on punitive damages unless MCS accepted a reduced sum of $50,000; instead, the court of appeals set the amount of reasonable punitive damages at $650,000. We conclude, as a matter of law, that the contract at issue is not too indefinite to enforce and that HABCO was not excused from performance by MCS's breach of contract. Therefore, we reverse the court of appeals' decision in part. However, we affirm the court of appeals' decision regarding the claims of conversion and unjust enrichment, and the award of punitive damages.

## I.

The factual background of this case is lengthy and complicated. HABCO is a regional certified public accounting firm with offices in La Crosse, Manitowoc, Marshfield, Medford, Green Bay, Sturgeon Bay, Wisconsin, and Winona, Minnesota. Part of HABCO's business involves providing accounting services to pub-

---

[2] For purposes of this opinion, Respondents will be collectively referred to as HABCO. However, it should be noted that Hawkins, Ash, Baptie, Inc. (HABINC) is a corporation owned by HABCO, and the individually named respondents are partners of HABCO.

lic housing authorities (PHAs).[3] In 1968, Robert Sierp and Robert Daley, employees of HABCO, worked together to develop computer programs to service PHA clients.

On January 1, 1970, HABCO incorporated MCS, which served as a separate department providing computer services to HABCO's clients. MCS also processed HABCO's internal accounting work, as well as its time and billing systems. In the late 1970's, MCS began pursuing opportunities to provide turnkey computer systems[4] to PHAs.

Initially, the HABCO partners and members of their families owned ninety percent of the shares of MCS stock and Sierp owned ten percent of the shares. However, on March 31, 1979, MCS redeemed the HABCO partners' and families' shares, leaving Sierp as sole shareholder. Sierp also became president of MCS. At the time of the redemption, neither HABCO nor MCS carried any of the existing software on their books as assets.

Prior to the redemption, HABCO and MCS began negotiating an agreement intended primarily to outline the terms and conditions under which MCS would provide HABCO with a computer and the software necessary to continue its monthly services accounting operations. An MCS employee[5] drafted the initial agreement, and it was later revised by HABCO. In fact, the agreement went through numerous revisions, with

---

[3] In fact, both HABCO and MCS license similar computer software and services to meet the accounting needs of PHAs. They are competitors in this area.

[4] A turnkey computer system is a total computer system including hardware, software, installation, training, and support services.

[5] The employee was not an attorney.

Sierp and James Ash, a HABCO partner, serving as the primary negotiators.

In addition, Gerard O'Flaherty, an attorney, reviewed one of the contract drafts. O'Flaherty sent a letter to MCS indicating that Attachment C should be re-drafted because of its "loose construction." During the trial, Ash testified that he was aware O'Flaherty had reviewed the agreement and made comments on it, but he was not aware of the content of those comments. In addition, both Ash and O'Flaherty testified that O'Flaherty was not representing HABCO, even though it paid half of his fees for reviewing the contract.

On June 1, 1979, shortly after the stock redemption, MCS and HABCO signed a thirty-one page "Contract for Computer Services and Equipment." The contract established four classes of software, with Classes III and IV being the most relevant to this case. Class III software (contract software) was jointly owned by MCS and HABCO, but there were certain restrictions on its use. In particular, Attachment C of the contract provides in pertinent part:

> HABCO shall have the use of the Jointly Owned Software on a single computer system as defined in this Agreement for an unrestricted number of clients.

> HABCO shall pay MCS 25% of the program value as identified in this Agreement for the use of the Jointly Owned Software on each additional computer system purchased through MCS, and installed or operated by HABCO.

Class IV software was application software, including most of the software needed to operate the PHA turnkey systems. However, Class IV software became Class III software pursuant to the contract, because HABCO

did not exercise an option to purchase it before November 1, 1979.

MCS subsequently developed additional proprietary software that was not covered by the contract (non-contract software). MCS and HABCO agreed that MCS could store back-up tapes containing the non-contract software at HABCO's offices.[6] In 1981 or early 1982, a HABCO employee and partner[7] copied programs from the back-up tapes onto HABCO's computer, backed it up on another tape, printed a copy of the software, and removed the software from the HABCO computer.[8] This process ensured that no one would be able to tell that the software had been copied to HABCO's computer. HABCO then used the programs in its own operations. In fact, HABCO changed its billing format so that MCS would not discover that HABCO was using the software to process accounts receivable.

On January 20, 1989, MCS filed suit in circuit court.[9] The complaint alleged several claims, including

---

[6] A back-up tape is a copy of the original software. Off-site storage of the back-up tapes ensured that the software would survive in the event of a fire or other damage at MCS's site.

[7] The parties dispute the extent of the partner's participation in the incident.

[8] The programs that were copied were PRS (payroll), AR (accounts receivable), CPR (commercial payroll) and AP (accounts payable).

[9] MCS initially filed suit against HABCO in federal district court. On December 16, 1988, the district court granted summary judgment dismissing MCS's federal claim under the Racketeer Influenced and Corrupt Organizations Act. MCS then filed its common law claims in state court. The decision of the district court was subsequently affirmed. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48 (7th Cir. 1989).

breach of contract, conversion, unjust enrichment, and punitive damages. The breach of contract claim involved the contract software, in particular, the software needed to run the PHA turnkey systems. MCS alleged that HABCO breached the contract by making unauthorized copies of the contract software, using those copies on equipment that was not purchased from MCS and was not the single computer system designated in the contract, and selling or licensing copies of the software to PHAs across the country. MCS's claims for conversion, unjust enrichment, and punitive damages were based on HABCO's copying of the non-contract software from MCS's back-up tape. In addition, HABCO filed a counterclaim for breach of contract against MCS.[10]

On October 1, 1990, MCS brought a motion in limine to exclude all testimony regarding ownership of the contract software prior to June 1, 1979, based on the parol evidence rule.[11] In its response, HABCO claimed that the parol evidence rule did not apply because the contract was ambiguous as to ownership of

[10] Although a provision in the contract provided that "this Agreement shall be governed by any applicable provisions of the Uniform Commercial Code," the claims filed by MCS and HABCO were based on the common law. Since this case has been tried under the common law, we do not consider the applicability of the Uniform Commercial Code.

[11] The court of appeals erroneously indicated that "MCS claimed the provisions of the contract were ambiguous and it sought leave before the trial to submit parol evidence on the intention of the parties regarding their contractual obligations." *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 196 Wis. 2d 578, 593, 539 N.W.2d 111 (Ct. App. 1995). In fact, the opposite is true. (R. 25 at 1, R. 27 at 1-3.) HABCO is the party that argued for the admission of parol evidence due to ambiguity. (R. 31 at 3-7.)

the software. The circuit court judge denied MCS's motion, and thus allowed parol evidence to be presented.

A jury trial was held on April 15 through April 26, 1991. In the opening statement, an attorney for HABCO said:

> Unfortunately one of the big problems in this case is the ambiguity of the contract. HABCO did not have legal representation, and that's—of course, when you have an ambiguous contract you wind up in a courtroom like this, and you have to leave it to ladies and gentlemen like yourselves to figure out what the parties meant by this contract. And this will be one of your important jobs in this case.

(R. 117 at 72.) In fact, much of the evidence presented by both HABCO and MCS related to their interpretations of the contract.

At the close of MCS's evidence, HABCO moved the court to dismiss the claim of breach of contract, based on its contention that the contract was not susceptible of MCS's alleged construction. The circuit court judge denied the motion. He specifically stated:

> There is a **reasonable disagreement** between the parties as to the interpretation of this contract, and if the interpretation of the contract as pled and claimed by the plaintiff is correct, why then the court would have to find that there would be evidence to support a finding that they, HABCO, had failed to pay 25 percent of the program value for the software. . . .

(R. 120-7 at 1068) (emphasis added.)

Again, at the close of all the evidence, HABCO moved the court to dismiss the breach of contract claim. However, this time HABCO argued that the contract

171

was void for indefiniteness.[12] The circuit court judge once more denied the motion, concluding:

> Certainly the interpretations that are being given to the contract now by the parties would come very close to finding that there was never a meeting of the minds as to what it was intended by the parties. But the contract is susceptible of different interpretations. The jury has heard [HABCO's] evidence concerning [its] understanding, Mr. Sierp has testified as to his understanding of the contract, each of the principals for the defendant have had their opportunity to testify to their understanding. . . . . **I'm satisfied that this issue of breach of contract by the plaintiffs, as well as by the defendant, will have to go to the jury, and the jury ought to make that decision on that.**

(R. 120-10 at 1424) (emphasis added.)

Accordingly, the court determined, without reserving a ruling, that all of the claims should go to the jury. When instructing the jury on the contract claim, the circuit court judge stated:

> MCS and HABCO agree that they entered into an agreement or contract on or about June 1, 1979. . . . For purposes of this cause of action you shall consider the June 1, 1979 agreement as a contract between MCS and HABCO. MCS and HABCO,

---

[12] HABCO also argued, in the alternative, that MCS had materially breached the contract prior to HABCO, and therefore HABCO was excused from future performance. Although the circuit court judge denied the motion, he only partially addressed this claim, by indicating: "Each of the breachs [sic] that are alleged by each of the parties are compensable by damages. . . ." (R. 120-10 at 1424.)

however, dispute their obligations under the contract's terms and conditions.

(R. 120-10 at 1456.) Furthermore, the court informed the jury they were to "determine the intention of the parties by considering the contract as a whole and evidence which bears upon the intention of the parties." (R. 120-10 at 1457-58.) HABCO did not object to these instructions, nor did it request Wis JI—Civil 3022, the pattern jury instruction on definiteness. The jury subsequently found: (1) HABCO breached the contract by failing to purchase computer hardware from MCS, failing to pay 25% of the program value to MCS for the use of the contract software, and failing to compensate MCS for its use of the proprietary software, resulting in damages totaling $1,520,750;[13] (2) HABCO converted MCS's non-contract software from the back-up tapes, resulting in damages of $65,000; (3) HABCO was unjustly enriched by copying the non-contract software, resulting in $1,000,000 of damages; and (4) HABCO's conduct was outrageous, with the jury assessing $1.75 million in punitive damages. In addition, the jury awarded HABCO $5,140 on its counterclaim against MCS for breach of contract.

On May 15, 1991, HABCO filed several motions after verdict. In particular, HABCO moved for an entry of JNOV regarding the breach of contract claim and counterclaim, because HABCO again argued that the contract was void for indefiniteness. Despite his earlier decisions, the circuit court judge granted the motion on July 12, 1991. In making his ruling, the circuit court

[13] MCS is not pursuing $250,750.00 of these damages, which is the amount the jury awarded for HABCO's failure to compensate MCS for its use of the proprietary software. (Petitioner's reply brief at p.9 n.4.)

judge indicated, "The parties in 1979 really never anticipated this . . . the contract does not provide for what happens in the event the parties each go their own way and become competitors." (R. 113 at 16.) Therefore, the circuit court judge determined: "This court is going to find that the contract of June 1, 1979 as it relates to the future relationship of the parties insofar as their use and maintenance of what has been described as the contract software is void for indefiniteness." (R. 113 at 19.) The circuit court judge provided no other reasoning for his decision.

The circuit court judge also concluded: "If, on appeal, it is determined that the trial court is in error, the Court alternatively holds that Defendants are excused from performing the contract because the jury determined on credible evidence that Plaintiff materially breached the contract before any breach occurred by the Defendants." (R. 61 at 2.) The circuit court judge largely based this decision on the jury's affirmative answer to the following question in the special verdict:

Question #3: Did the plaintiff (MCS) **materially breach** the June 1, 1979, contract by:
(a) failing to pay the defendants (HABCO, HABINC) 10% of the program value for contract software provided and installed for the defendants' clients?
ANSWER: Yes

(R. 52 at 4) (emphasis added.) Evidence produced at trial indicated that this "material breach" by MCS preceded any breach of the contract by HABCO.

In addition, pursuant to HABCO's motion after verdict, the circuit court reduced the jury award for conversion from $65,000 to $62,000 by changing the jury answer in the verdict. The circuit court also

174

changed the jury answer regarding unjust enrichment, reducing the award from $1,000,000 to $0.[14] Both of these decisions were based on the court's conclusion that MCS had not proven its damages with sufficient credible evidence.[15]

Finally, the circuit court judge ordered a new trial on punitive damages[16] unless MCS accepted a reduced sum. He concluded that the jury's award of $1.75 million was excessive and therefore constituted a violation of due process. The circuit court judge determined $50,000 was a reasonable award, stating, "I believe there has to be some rational relationship between the amount of the compensatory damages and the punitive damages," and "If the defendants has [sic] been charged criminally with the theft of these tapes, the maximum penalty that this court could have imposed would have been a $10,000.00 fine." (R. 113 at 11.) The circuit court judge provided no other explanation for the reasonableness of the $50,000 award.[17]

---

[14] Note that the circuit court did not provide MCS with the option of requesting a new trial on the issue of damages if it rejected the reduced conversion and unjust enrichment awards, as is typically the case with remittitur. *See, e.g., Powers v. Allstate Ins. Co.*, 10 Wis. 2d 78, 91-92, 102 N.W.2d 393 (1960). In fact, in its order, the circuit court did not indicate that it was ordering remittitur, but instead stated that it was changing the jury answers for unjust enrichment and conversion.

[15] The circuit court also determined that the awards for conversion and unjust enrichment were duplicative. The court of appeals did not discuss the duplication issue. We also do not reach this finding.

[16] The judge ordered a new trial both as to whether HABCO's conduct was outrageous and as to the amount of punitive damages.

[17] MCS rejected the reduced amount. A new trial on punitive damages was held on October 27, 1992. MCS called only one

The court of appeals reversed the circuit court's decision in part and affirmed it in part. The court affirmed the circuit court's conclusion that the contract was void for indefiniteness,[18] and its elimination of the unjust enrichment award for lack of sufficient evidence as to damages. However, the court of appeals reversed the circuit court's reduction of the conversion award, because it determined that MCS had established damages of $65,000 with sufficient definiteness. In addition, although it concluded that the $1.75 million punitive damage award excessive, and, therefore, a violation of due process, the court of appeals reversed the circuit court's determination that $50,000 was a reasonable punitive damages award. Instead, the court of appeals set the amount of reasonable punitive damages at $650,000.

## II.

Initially, we consider the standard of review applicable to a circuit court's decision to enter JNOV. A motion for JNOV does not challenge the sufficiency of the evidence to support the verdict. *Kolpin v. Pioneer Power & Light Co.*, 162 Wis. 2d 1, 28-30, 469 N.W.2d 595 (1991); *Herro v. Department of Natural Resources*, 67 Wis. 2d 407, 413-14, 227 N.W.2d 456 (1975); *Wozniak v. Local 1111 of United Elec. Radio & Mach. Workers of America*, 57 Wis. 2d 725, 733, 205 N.W.2d

witness and rested. The court granted HABCO's motion to dismiss MCS's punitive damages claim without objection from MCS.

[18] The court of appeals therefore did not reach HABCO's material breach argument. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 196 Wis. 2d 578, 593-97, 539 N.W.2d 111 (Ct. App. 1995).

369 (1973). Rather, "[a] motion for judgment notwithstanding the verdict admits for purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted the moving party on grounds other than those decided by the jury." *Kolpin*, 162 Wis. 2d at 28 (quoting *Herro*, 67 Wis. 2d at 413-14); *see also* Wis. Stat. § 805.14(5)(b) (1989-90).[19] Accordingly, a court should enter JNOV where the facts found by the jury are not sufficient as a matter of law to constitute a cause of action. *Wozniak*, 57 Wis. 2d at 733 (quoting *State v. Escobedo*, 44 Wis. 2d 85, 90, 91, 170 N.W.2d 709 (1969)). We review a circuit court's grant of a motion for JNOV *de novo*, since such a decision involves a question of law. *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1195 (7th Cir. 1992); *Logterman v. Dawson*, 190 Wis. 2d 90, 101, 526 N.W.2d 768 (Ct. App. 1994), *review denied*, 531 N.W.2d 327 (1995); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 120 Wis. 2d 591, 601, 357 N.W.2d 287 (Ct. App. 1984), *rev'd on other grounds*, 127 Wis. 2d 127, 377 N.W.2d 605 (1985).

With this in mind, we consider whether the circuit court correctly entered JNOV on the breach of contract claim and counterclaim. Initially, we discuss the relationship between contract ambiguity and indefiniteness. A contract provision is ambiguous if it is fairly susceptible of more than one construction. *See, e.g., Bank of Sun Prairie v. Opstein*, 86 Wis. 2d 669, 676, 273 N.W.2d 279 (1979); *Jones v. Jenkins*, 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). When a contract provision is ambiguous, and therefore must be construed by the use of extrinsic evidence, the question is one of contract interpretation for the jury. *E.g., Jones*,

[19] All further references are to the 1989-90 Statutes unless otherwise indicated.

88 Wis. 2d at 722; *Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 379, 254 N.W.2d 463 (1977); *RTE Corp. v. Maryland Cas. Co.*, 74 Wis. 2d 614, 621, 247 N.W.2d 171 (1976); *Patti v. Western Mach. Co.*, 72 Wis. 2d 348, 353, 241 N.W.2d 158 (1976).

An ambiguous contract is not necessarily indefinite. Vagueness or indefiniteness as to an essential term of the agreement **prevents the creation** of an enforceable contract, because a contract must be definite as to the parties' basic commitments and obligations. *Shetney v. Shetney*, 49 Wis. 2d 26, 38-39, 181 N.W.2d 516 (1970); *Witt v. Realist, Inc.*, 18 Wis. 2d 282, 297, 118 N.W.2d 85 (1962). Therefore, the definiteness requirement is relevant to contract formation, not interpretation. The issue of definiteness may be decided by the jury, *see* Wis JI—Civil 3022, or by the court as a matter or law. *Shetney*, 49 Wis. 2d at 38.[20]

Courts often describe the definiteness requirement as mutual assent, or "meeting of the minds." *See* Wis JI—Civil 3010; 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 4.13, at 634-37 (Joseph M. Perillo, revised ed. 1993). Yet, this does not mean that parties must subjectively agree to the same interpretation at the time of contracting. Instead, mutual assent is judged by an objective standard, looking to the express words the parties used in the contract. *See Marion v. Orson's Camera Ctrs., Inc.*, 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966) (indicating that the key is "not necessarily what [the parties] intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the lan-

[20] In the present case, the definiteness question was not submitted to the jury; instead, it was decided as an issue of law by the court—one way before the verdict of the jury, the other way on motions after verdict.

178

guage they saw fit to use."); *see also* 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.6, at 168-72 (1990) (courts generally accept the objective theory of assent). As one court explains:

> The premise—that a "meeting of the minds" is required for a binding contract—obviously is strained. [citation omitted]. Most contract disputes arise because the parties did not foresee and provide for some contingency that has not materialized—so there was no meeting of minds on the matter at issue—yet such disputes are treated as disputes over contractual meaning. . . . So a literal meeting of the minds is not required for an enforceable contract, which is fortunate, since courts are not renowned as mind readers.

*Colfax Envelope Corp. v. Local No. 458-3M*, 20 F.3d 750, 752 (7th Cir. 1994).[21]

If parties evidently intended to enter a contract, the trier of fact should not frustrate their intentions, but rather should attach a "sufficiently definite meaning" to the contract language if possible. *See Shetney*, 49 Wis. 2d at 39; SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 37, at 110-11 (Walter H. E. Jaeger, 3d ed. 1957). We have previously decided: "Even though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by their subsequent conduct and by their own practical interpretation." *Nelson v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 51, 90 N.W.2d 123 (1958). There-

---

[21] It has been suggested that the term "meeting of the minds" should be abandoned, due to the misunderstanding it frequently causes. *See* 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.6, at 168 n.2 (1990).

fore, if the jury can determine the parties' intentions, "indefiniteness disappears as a reason for refusing enforcement." 1 CORBIN ON CONTRACTS § 4.1, *supra*, at 544. As Judge (later Justice) Cardozo has stated, "Indefiniteness must reach the point where construction becomes futile." *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*, 133 N.E. 370, 371 (N.Y. 1921).

Turning to the present case, we disagree with the circuit court's decision that the contract is void for indefiniteness.[22] We initially emphasize that HABCO claims the contract is too indefinite because: "Based on the testimony given by the plaintiff and the defendants at the trial, it is clear that there was never an agreement or understanding between the parties on any of the essential terms of the contract." (R. 56 at 7; *see also* Respondent's brief at pp.25-31.) The circuit court judge apparently accepted this argument. In making his ruling on HABCO's motion after verdict, he stated, "So the breach of contract claim in this case. . .developed into a claim which as far as this court is concerned the parties never anticipated in their original contract. It was never provided for under the original contract." (R. 113 at 18.)

However, the contradictory testimony presented by the parties, in particular that of Sierp and Ash, does not support a conclusion that the contract is void for indefiniteness for two reasons. First, parties do not need to agree subjectively to the same interpretation at the time of contracting in order for there to be a mutual assent, because a literal "meeting of the minds" is not

---

[22] We do, however, agree with the circuit court that the contract was ambiguous, and therefore conclude that the circuit court properly sent the question of contract interpretation to the jury.

required. *See Colfax Envelope Corp.*, 20 F.3d at 752. Instead, mutual assent is judged by an objective standard, looking to the express words the parties used in the contract. *See Marion*, 29 Wis. 2d at 345; FARNSWORTH § 3.6, *supra*, at 168-72. Second, when parties disagree about their intentions at the time they entered into a contract, the question is one of contract interpretation for the jury, not mutual assent or contract formation. *Patti*, 72 Wis. 2d at 353; *Lemke v. Larsen Co.*, 35 Wis. 2d 427, 431, 151 N.W.2d 17 (1967). In fact, if a disagreement between parties as to their intent could support a claim of indefiniteness, juries would rarely be called upon to interpret a contract, because nearly every contract challenged in court would be void for indefiniteness.

HABCO also claims its contention that the contract is too indefinite is supported by the letter attorney O'Flaherty sent to MCS indicating that Attachment C should be re-drafted because of its "loose construction." Yet, HABCO knew that an attorney had been retained to review the contract, knew that he had commented on the contract, and in fact paid half O'Flaherty's fees. It appears from the record that HABCO made no effort to find out the content of those comments. Parties often agree to a contract provision that is ambiguous and thereby gamble on a favorable interpretation should a dispute arise, rather than take the time to work out all their possible disagreements, especially since such disagreements may never have any consequence. *Colfax Envelope Corp.*, 20 F.3d at 754. When this occurs, the entire contract is not void for indefiniteness; instead, the parties submit to have any dispute over interpretation resolved by a jury. *Id.* This is the function of a jury in a contract case—to

resolve interpretive questions founded on ambiguity. *Id.*

We therefore conclude that the evidence does not support HABCO's claim and the circuit court's determination that the contract was void for indefiniteness. In fact, the contradictory testimony presented by the parties, along with the O'Flaherty letter, only further illustrates that the relevant issue in this case was one of interpretation of the parties' intent, not one of mutual assent or indefiniteness.

Furthermore, we emphasize that the jury was able to attach a sufficiently definite meaning to the contract language, and therefore "indefiniteness disappears as a reason for refusing enforcement." 1 CORBIN ON CONTRACTS § 4.1, *supra*, at 544; *see also Shetney*, 49 Wis. 2d at 39; WILLISTON ON CONTRACTS, § 37, *supra* at 110-11. Specifically, the jury, by its answers to the questions in the special verdict, interpreted the ambiguous language of Attachment C as requiring HABCO to purchase additional computers from MCS, and forbidding HABCO from running the contract software on computers purchased from other vendors.[23] There was evidence to support this interpretation. Sierp testified that Attachment C provided HABCO "could not use [contract] software on computers unless they were purchased through MCS," and "the objective was if [HABCO] was going to use . . .contract software, that they would buy a computer from us." (R. 120-2 at 72; R. 120-3 at 292.) The jury was entitled to find this evidence more credible than the evidence presented by HABCO.

---

[23] The jury made this determination even though it was well aware of the fact that Attachment C did not, in clear, unambiguous terms, require this.

Accepting the facts found by the jury in the verdict to be true, as we are required to do in reviewing an entry of JNOV, we find no support for HABCO's claim and the circuit court's determination that the contract is void for indefiniteness. We therefore conclude that the contract is not void for indefiniteness.

Accordingly, we must next consider whether HABCO was excused from future contract performance due to MCS's prior material breach, which was the alternate reason given by the circuit court in granting entry of JNOV. It is well established that a material breach by one party may excuse subsequent performance by the other. *Metropolitan Sewerage Comm'n v. R. W. Constr.*, 72 Wis. 2d 365, 387, 241 N.W.2d 371 (1976); *Entzminger v. Ford Motor Co.*, 47 Wis. 2d 751, 755, 177 N.W.2d 899 (1970); *Shy v. Industrial Salvage Material Co.*, 264 Wis. 118, 125, 58 N.W.2d 452 (1953). However, a party is not automatically excused from future performance of contract obligations every time the other party breaches. "If the breach is relatively minor and not 'of the essence', the plaintiff is himself still bound by the contract; he can not abandon performance and get damages for a 'total' breach by the defendant." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 700, at 310 (1960); *see also Myrold v. Northern Wis. Coop. Tobacco Pool*, 206 Wis. 244, 248, 239 N.W. 426 (1931). In other words, "there must be so serious a breach of the contract by the other party as to destroy the essential objects of the contract." *Appleton State Bank v. Lee*, 33 Wis. 2d 690, 692, 148 N.W.2d 1 (1967).[24] Moreover,

---

[24]*Appleton State Bank* involved the similar issue of rescission, and therefore the court's definition of "material breach" is helpful in this case.

even where such a material breach has occurred, the non-breaching party may waive the claim of materiality through its actions. *See Entzminger*, 47 Wis. 2d at 755.[25]

The issue of whether a party's breach excuses future performance of the contract by the non-breaching party presents a question of fact. *Shy*, 264 Wis. at 125. The Restatement of Contracts lists several circumstances relevant to this determination, including the extent to which the injured party will be deprived of the benefit that he or she reasonably expected, and the extent to which the injured party can be adequately compensated for his or her loss. RESTATEMENT (SECOND) OF CONTRACTS §§ 241, 242 (1981).[26]

We initially note that, in this case, the only way in which the material breach issue was presented to the jury was through the following questions in the special verdict:

> Question #3: Did the plaintiff (MCS) **materially breach** the June 1, 1979, contract by:
> (a) failing to pay the defendants (HABCO, HABINC) 10% of the program value for contract software provided and installed for the defendants' clients?
>
> ANSWER: Yes

---

[25] For example, a non-breaching party may waive the materiality by continuing to live with the contract as if it existed. *See Entzminger v. Ford Motor Co.*, 47 Wis. 2d 751, 755, 177 N.W.2d 899 (1970).

[26] See RESTATEMENT (SECOND) OF CONTRACTS §§ 241, 242 (1981) for a full listing of the relevant considerations.

184

(b) inserting Class II software into the Class III and Class IV software so as to make that software unusable?

ANSWER: No

(c) using school payroll software (SPR) for preparing other payroll software?

ANSWER: No

(R. 52 at 4.) The court did not instruct the jury on the definition of "material breach," or in any way explain to the jury the type of breach that is necessary to excuse future contract performance by the non-breaching party. Furthermore, HABCO did not request such an instruction, nor did it request a question in the special verdict asking the jury if the breach by MCS was so substantial as to destroy the essential objects of the contract. We disagree with the circuit court's determination that "this jury in considering the evidence that was presented without doubt found that the plaintiff's breach . . . was a material breach of the contract." (R. 113 at 19.) The jury's affirmative answer to question #3 in the special verdict is not sufficient to support this determination, particularly in light of the lack of instruction the jury received on the issue.[27]

■■■

Since this issue was not adequately presented to the jury, we must consider whether MCS's breach was so substantial as to destroy the essence of the contract and thereby excuse HABCO from subsequent performance. We determine that it was not. First, we conclude

---

[27] In addition, a jury award of $5,140.00 in contract damages to HABCO does not, on its face, support a determination that the jury had found MCS's breach was so substantial that it destroyed the essential objects of the contract, especially since the jury assessed a total of $1,520,750.00 in damages against HABCO for breach of contract.

185

that MCS's breach did not significantly deprive HABCO of the benefit it reasonably expected under the contract, because the contract was substantially performed by each of the parties, as indicated by the circuit court. (R. 113 at 15.) Second, we conclude that HABCO can be adequately compensated for its loss through money damages, as was also determined by the circuit court. (R. 120-10 at 1424.)

We additionally conclude that HABCO waived this claim through its actions during the trial. Specifically, when it brought its motion at the close of the evidence, HABCO stated, "We don't contend that the evidence that's been presented in this court regarding the plaintiff's failure to pay ten percent of the program value on three occasions is the kind of breach that justifies excusing the defendant from performance. . . ." (R. 120-10 at 1408.) Instead, HABCO contended that MCS's two other alleged breaches were so substantial as to excuse HABCO from future performance. However, the jury found that the only way in which MCS had breached the contract was by failing to pay ten percent of the program value for contract software provided and installed for the defendants' clients. (R. 52 at 4.) HABCO's concession, that this particular breach by MCS was not a material breach excusing its subsequent performance, waived the materiality claim it now makes. *See Entzminger*, 47 Wis. 2d at 755.

For all of these reasons, we conclude that HABCO was not excused from future performance because of MCS's breach. Thus, the jury verdict for both parties regarding breach of contract should be reinstated.[28]

---

[28] Accordingly, MCS will receive the amount of $1,270,000 awarded by the jury for its breach of contract claim, and

## III.

We next consider the circuit court's decision to change the jury answers in order to reduce the conversion award from $65,000 to $62,000, and reduce the unjust enrichment award from $1,000,000 to $0. "The rule to guide the trial court and this court, when requested to change an answer in a jury verdict, is the evidence will be viewed in the light most favorable to the verdict and the verdict will be affirmed if supported by any credible evidence." *Nelson v. Travelers Ins. Co.*, 80 Wis. 2d 272, 282-83, 259 N.W.2d 48 (1977); *see also* Wis. Stat. § 805.14(1);[29] *Giese v. Montgomery Ward, Inc.*, 111 Wis. 2d 392, 408-09, 331 N.W.2d 585 (1983). Therefore, in order to uphold the decision of the circuit court, we must conclude that there is no credible evidence to support the jury verdict regarding MCS's damages for conversion and unjust enrichment. *Hall v. Arthur Overgaard, Inc.*, 55 Wis. 2d 247, 250-51, 198 N.W.2d 605 (1972). We have also indicated, "When the jury hears conflicting testimony about unliquidated damages, its verdict should not be disturbed on review when it is clear that the award arrived at is well within the range of figures placed in evidence, and that there is credible evidence to sustain the jury's finding." *Carl-*

HABCO will receive the jury award of $5,140 for its breach of contract claim.

[29] Section 805.14(1) provides: "No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such a party."

187

*son & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 190 Wis. 2d 650, 674, 529 N.W.2d 905 (1995).[30]

This court has defined conversion as "the wrongful exercise of dominion or control over a chattel." *Production Credit Ass'n v. Nowatski*, 90 Wis. 2d 344, 353-54, 280 N.W.2d 118 (1979). Conversion damages are intended to compensate a wronged party for the loss sustained because his or her property was wrongfully taken. *Traeger v. Sperberg*, 256 Wis. 330, 333, 41 N.W.2d 214 (1950). Thus, an owner of converted property generally may recover its value at the time of the wrongful taking, plus interest to the date of trial. *Id.*; *Nowatski*, 90 Wis. 2d at 354.

Conversion is distinct from unjust enrichment. "[A]n action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Watts v. Watts*, 137 Wis. 2d 506, 530, 405 N.W.2d 303 (1987); *accord Arjay Inv. Co. v. Kohlmetz*, 9 Wis. 2d 535, 539, 101 N.W.2d 700 (1960). Accordingly, unjust enrichment is based on equitable principles, with damages being measured by the benefit conferred upon the defendant, not the plaintiff's loss. *See Ramsey v. Ellis*, 168 Wis. 2d 779, 785, 484 N.W.2d 331 (1992) (noting measure of damages for unjust enrichment); *Graf v. Neith Coop. Dairy Prods. Ass'n*, 216 Wis. 519, 522-23, 257 N.W. 618 (1934). As this court has determined, "Establishing a loss of profit by the plaintiff does not

---

[30] Although *Carlson* is a case involving an order of remittitur, it is relevant to this issue because the circuit court judge changed the jury answers to reduce the amount of the awards for conversion and unjust enrichment. Therefore, the effect of this action was similar to that of an order of remittitur.

prove unjust enrichment of the defendant." *Graf*, 216 Wis. at 523.

In addition, damages must be proven with reasonable certainty. *See, e.g., Nowatski*, 90 Wis. 2d at 356; *Cutler Cranberry Co. v. Oakdale Elec. Coop.*, 78 Wis. 2d 222, 233, 254 N.W.2d 234 (1977). However, this does not mean that a plaintiff must prove damages with mathematical precision; rather, evidence of damages is sufficient if it enables the jury to make a fair and reasonable approximation. *Carlson & Erickson Builders*, 190 Wis. 2d at 673; *Cutler Cranberry Co.*, 78 Wis. 2d at 233.

Turning to the case at hand, we conclude that there is credible evidence to support the jury award for conversion. Specifically, MCS introduced evidence that HABCO paid $62,000 in 1989 and 1990 to replace the software copied from the back-up tapes. Furthermore, as the court of appeals concluded, "The jury could have taken into account that between the conversion in the early 1980's to the date of trial in 1991, the value of the use of $62,000 amounts to some $3,000." *Management Computer Servs.*, 196 Wis. 2d at 598-99. Accordingly, the jury award is supported by credible evidence. *See Carlson Erickson Builders*, 190 Wis. 2d at 674. We therefore affirm the court of appeals' decision to reinstate the $65,000 award for conversion.

Second, we conclude that there is no credible evidence to support the jury award for unjust enrichment. During the trial, MCS attempted to prove its damages for unjust enrichment by introducing evidence of the gross revenues HABCO derived from licensing the accounts payable and payroll programs to PHAs under HABCO's turnkey program. However, in order to suffi-

ciently prove damages for unjust enrichment, MCS needed to establish the net profits HABCO received from its wrongful act. MCS failed to do this. Evidence of gross revenues is insufficient to establish HABCO's net profits because it does not account for the sales expenses and software updating costs HABCO incurred.

In addition, MCS attempted to prove its damages for unjust enrichment by introducing evidence of the amount it would have charged HABCO for processing its accounts receivable and payroll. However, this evidence is also insufficient, because unjust enrichment is not measured by the plaintiff's loss. Therefore, contrary to MCS's contention, the jury cannot make a fair and reasonable approximation of unjust enrichment damages by considering the amount of MCS's lost profits.

## IV.

■■■■■

Finally, we consider whether the circuit court correctly ordered a new trial on punitive damages unless MCS accepted a reduced award of $50,000. This court established the standard for appellate review of a circuit court's remittitur order in regard to compensatory damages in *Powers v. Allstate Ins. Co.*, 10 Wis. 2d 78, 102 N.W.2d 393 (1960), and extended the *Powers* rule to punitive damages in *Malco, Inc. v. Midwest Aluminum Sales, Inc.*, 14 Wis. 2d 57, 109 N.W.2d 516 (1961). Today, we once again reaffirm the *Powers* rule.[31]

---

[31] In so doing, we reject MCS's invitation to adopt a standard that would require courts to affirm a jury verdict unless there is **no credible evidence** to support it. *See* Hon. Thomas Cane & Suzanne D. Strater, "Blurring the rules of judge and jury: The circuit court's discretion in additur and remittitur,"

Under the *Powers* rule, a reviewing court will reverse a circuit court's remittitur order only if it determines that the circuit court erroneously exercised its discretion. *Carlson & Erickson Builders*, 190 Wis. 2d at 669; *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 229-31, 291 N.W.2d 516 (1980). Furthermore, a reviewing court must not find an erroneous exercise of discretion if the "record shows that discretion was in fact exercised and there exists a reasonable basis for the circuit court's determination after resolving any direct conflicts in the testimony in favor of the prevailing party, even if the reviewing court would have reached a different conclusion than the circuit court." *Carlson & Erickson Builders*, 190 Wis. 2d at 669; *accord Fahrenberg*, 96 Wis. 2d at 229-30.

However, where a circuit court fails to analyze the evidence or set forth the reasons supporting its decision, the reviewing court should give no deference to the circuit court's decision. *Carlson & Erickson Builders*, 190 Wis. 2d at 669; *Fahrenberg*, 96 Wis. 2d at 230. Instead, in such a case, the reviewing court must

---

*Wisconsin Lawyer* 5, 6 (July 1995) (generally discussing additur and remittitur without specific reference to the issue of punitive damages). "Judicial review of the size of punitive damage awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded." *Honda Motor Co. v. Oberg*, 114 S. Ct. 2331, 2335 (1994). However, if we adopted MCS's proposed standard of review, we would effectively eliminate this well-established safeguard. Accordingly, MCS's proposed standard of review violates due process. *See id.* at 2334 (holding that an amendment to the Oregon Constitution prohibiting judicial review of a jury award of punitive damages "unless the court can affirmatively say there is no evidence to support the verdict" violates due process).

examine the entire record *ab initio* to determine whether the jury award is excessive, and if so, what amount of damages is reasonable. *Carlson & Erickson Builders*, 190 Wis. 2d at 669; *Fahrenberg*, 96 Wis. 2d at 230-31. In making its determination, the reviewing court must view the evidence in the light most favorable to the jury verdict. *Carlson & Erickson Builders*, 190 Wis. 2d at 669-70; *Fahrenberg*, 96 Wis. 2d at 231. As we have indicated, "The amount [of punitive damages] rests initially in the discretion of the jury. We are reluctant to set aside an award because it is large or we would have awarded less." *Fahrenberg*, 96 Wis. 2d at 236.[32]

In this case, the circuit court set forth conclusory reasons for reducing the jury's punitive damages award of $1.75 million to $50,000. Accordingly, because it did not analyze the evidence or set forth its reasons for ordering remittitur with particularity, we place no weight on the circuit court's conclusions. We therefore review the entire record *ab initio* to determine whether the jury's award is excessive, and if it is, what amount

---

[32] Although a reviewing court must consider the evidence in the light most favorable to the verdict, this does not mean that *ab initio* review is a lower standard than *de novo* review, as MCS claims. (Petitioner's brief at 12.) When conducting *ab initio* review of a jury award for punitive damages, the court looks at the entire record as a matter of first impression, giving no weight to the circuit court's findings. *See Fahrenberg v. Tengel*, 96 Wis. 2d 211, 224 n.7, 230-31, 291 N.W.2d 516 (1980). This is the same as *de novo* review. *See generally State v. Annala*, 168 Wis. 2d 453, 460, 484 N.W.2d 138 (1992) (in applying *de novo* review, this court gives no deference to lower courts); Michael S. Heffernan, *Appellate Practice and Procedure in Wisconsin* § 3.6, at 3-10—3-11 (2d ed. 1995) (using terms "*ab initio*" and "*de novo*" interchangeably).

of punitive damages is reasonable. *See Carlson & Erickson Builders*, 190 Wis. 2d at 669; *Fahrenberg*, 96 Wis. 2d at 230.

The Due Process Clause of the Fourteenth Amendment imposes substantive limits on the size of punitive damage awards. *E.g.*, *Honda Motor Co. v. Oberg*, 512 U.S. 415, —, 114 S. Ct. 2331, 2335 (1994); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 1043 (1991). As the Supreme Court has determined, "[a] general concer[n] of reasonableness. . .properly enter[s] into the constitutional calculus." *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458 (1993) (quoting *Haslip*, 499 U.S. at 18). An award is excessive and therefore violates due process if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing. *Tucker v. Marcus*, 142 Wis. 2d 425, 446, 418 N.W.2d 818 (1988); *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 303, 294 N.W.2d 437 (1980); *Fahrenberg*, 96 Wis. 2d at 234; *see also BMW of North America, Inc. v. Gore*, — U.S. —, 116 S. Ct. 1589, 1595 (1996). As we have stated, "Punitive damages ought to serve its purpose." *Malco*, 14 Wis. 2d at 66. The purpose of punitive damages is to punish the wrongdoer and to deter the wrongdoer and others from similar conduct, not compensate the plaintiff for any loss.[33] *Wangen*, 97 Wis. 2d at 303 (citing *Fahrenberg*, 96 Wis. 2d at 234); *Malco*, 14 Wis. 2d at 66.

---

[33] In fact, this court has labeled punitive damages as "smart money," because such damages are intended to hurt the defendant in order to punish and deter. *Brown v. Maxey*, 124 Wis. 2d 426, 439-40, 369 N.W.2d 677 (1985) (quoting *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 233, 291 N.W.2d 516 (1980)).

■■

Accordingly, in determining whether an award of punitive damages is excessive, courts should consider the grievousness of the acts, the degree of malicious intent, whether the award bears a reasonable relationship to the award of compensatory damages, the potential damage that might have been caused by the acts, the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct, and the wealth of the wrongdoer. *BMW*, 116 S. Ct. at 1598-1603; *Tucker*, 142 Wis. 2d at 446-47; *Brown*, 124 Wis. 2d at 438-39; *Wangen*, 97 Wis. 2d at 302; *Dalton v. Meister*, 52 Wis. 2d 173, 180-81, 188 N.W.2d 494 (1971), *cert. denied*, 405 U.S. 934 (1972); *Malco*, 14 Wis. 2d at 66. Similarly, if an award is determined to be excessive, courts should consider these factors in determining the proper amount to be awarded as punitive damages. *See Tucker*, 142 Wis. 2d at 446-47; *Fahrenberg*, 96 Wis. 2d at 234-36.

■■

In addition, a reviewing court must consider the reasonableness of punitive damages on a case-by-case basis, considering the relevant circumstances in each particular case. *Tucker*, 142 Wis. 2d at 447; *Wangen*, 97 Wis. 2d at 302-03; *Fahrenberg*, 96 Wis. 2d at 233-34. We recognize that a reasonable relationship between the amount of compensatory damages, and criminal penalties, and the proper amount of punitive damages is required. This court, however, rejects the notion that courts can use a multiplier, or fixed ratio of compensatory-to-punitive damages or criminal fines-to-punitive damages, to calculate the amount of reasonable punitive damages. *See Tucker*, 142 Wis. 2d at 447-48; *Fahrenberg*, 96 Wis. 2d at 235-36; *see also BMW*, 116 S. Ct. at 1602-03 ("Of course, we have consistently

rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."). As this court has indicated, "The test of excessiveness does not necessarily depend upon some arbitrary proportion." *Malco*, 14 Wis. 2d at 66.

In the present case, we consider the following facts to be particularly relevant. First, HABCO's wrongful act was both grievous and malicious. HABCO copied software MCS had entrusted it to protect. HABCO then used the software in competition against MCS. This act was intentional, which is evidenced by the fact that HABCO acted in a manner that ensured no one would be able to tell that they had copied the software to their own computer, and then changed their billing format so that MCS would not discover the wrongdoing. However, although HABCO's conduct is reprehensible, it caused only economic injury to MCS. As the United States Supreme Court has indicated, "[N]onviolent crimes are less serious than crimes marked by violence." *BMW*, 116 S. Ct. at 1599 (quoting *Solem v. Helm*, 463 U.S. 277, 292-3 (1983)).

Second, HABCO's wrongdoing resulted in $65,000 damages to MCS.[34] Third, the potential criminal penalty for copying computer programs if the damage is greater than $2,500 is a fine not exceeding $10,000. *See* Wis. Stat. § 943.70(2). Fourth, although MCS did not present evidence of HABCO's net worth, the record does indicate that HABCO is a regional accounting firm with a relatively small number of offices.[35]

---

[34] Note that the jury could only award punitive damages on MCS's tort claims.

[35] During closing arguments, the only figure suggested to the jury for a punitive damage award was $2.5 million, the same figure asked for in the complaint of MCS. Counsel for MCS told

195

In light of these facts, we hold that the jury award of $1.75 million is excessive and therefore a violation of due process, because it is more than is necessary to serve the purposes of punitive damages. Although we acknowledge that HABCO engaged in affirmative acts of misconduct requiring a substantial penalty in order to punish and deter, we also emphasize that HABCO's wrongful conduct caused only economic injuries to MCS. In addition, we are persuaded by the fact that the jury award of punitive damages is considerably greater than the amount of compensatory damages or possible criminal sanctions for comparable misconduct. Furthermore, HABCO is not a large, national accounting firm. In short, under the circumstances, a punitive damages award of $1.75 million is shocking to the conscience of the court. *See Fahrenberg*, 96 Wis. 2d at 236.

The court of appeals, which also determined that the jury award of $1.75 million in punitive damages was excessive, set the amount of punitive damages at $650,000. We likewise conclude that $650,000 is a reasonable award of punitive damages under the facts of this case. This amount is substantial enough to serve the goals of punishment and deterrence.[36] In particular, $650,000 is an appropriate amount to punish a regional accounting firm of HABCO's size. In addition, $650,000 is a significant enough sum that will deter

the jury that HABCO was a "big accounting firm," and that there was a need to send it a "big message." Counsel for HABCO did not suggest any figure, since he argued that punitive damages should not be awarded (R. 118 at 24 and 79-80.)

[36] An award of $50,000, which does not even equal MCS's compensatory damages, is not sufficient to punish HABCO and deter HABCO and others from similar conduct in the future.

HABCO and other firms of similar size from illegally copying software in the future.

However, an award of $650,000 is not so large that it is disproportionate to the wrongdoing, which inflicted only economic harm. This amount also bears a reasonable relationship to the amount of compensatory damages and possible criminal sanctions. We therefore affirm the court of appeals' decision in this regard, because we conclude that an award of $650,000 serves the purposes of punitive damages.

In conclusion, we hold, as a matter of law, that the contract is not too indefinite to be enforced and that performance by HABCO was not excused by MCS's breach of contract. The jury verdict for both parties regarding breach of contract therefore should be reinstated. Second, we conclude that credible evidence supports the jury award of $65,000 to MCS on its conversion claim, and accordingly affirm the court of appeals' decision to reinstate the award. However, we also conclude that there is no credible evidence to support the jury award of $1,000,000 to MCS for unjust enrichment damages, and thus affirm the court of appeals' and circuit court's decisions to eliminate the award. Finally, we hold that the jury award of $1.75 million in punitive damages is excessive and therefore a violation of due process. Instead, we conclude that an award of $650,000 is reasonable, because such an award serves the purposes of punishment and deterrence. Thus, MCS should be given the option of accepting that amount or having a new trial limited to the issue of the amount of punitive damages.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and cause remanded.

JON P. WILCOX, J., withdrew from participation.