# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3632

INTERNATIONAL PRODUCTION SPECIALISTS, INC.,

*Plaintiff-Appellant,*

*v.*

SCHWING AMERICA, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 621—**Rudolph T. Randa,** *Chief Judge.*

ARGUED SEPTEMBER 5, 2008—DECIDED SEPTEMBER 2, 2009

Before FLAUM, ROVNER and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* International Production Specialists, Inc. (IPS) entered into a contract with Schwing America, Inc. (Schwing) to make and install five silos to store and treat sludge at a wastewater treatment plant owned by the general contractor, North Shore Sanitary District (NSSD). Initially IPS's piece of the process was to take about eight months. After several years of delays—some attributable to NSSD, some to IPS, and some to events

beyond anyone's control—nearly three-and-a-half years after the parties signed the initial purchase order, the project still had not been completed. On February 11, 2005, Schwing notified IPS that it was cancelling the contract for cause. IPS responded by suing for breach of contract and Schwing countersued. The district court ruled in favor of Schwing, awarding damages in the amount of $467,140.02. We affirm, but remand in part to correct a small error in the calculation of damages.

## I.

This case comes to this court after a trial in the district court. The facts of this case, as determined by the trial court, are long and tedious, but necessary for a full understanding of the intricacies of the relationship between the parties.

Schwing and IPS were both subcontractors on a larger project to build a wastewater treatment facility. In 2001, NSSD hired Voest-Alpine Industries, Inc. (VA Tech) to work on the construction of its new wastewater treatment plant in Waukegan, Illinois, agreeing to pay it $6.6 million. VA Tech, in turn, entered into a $1.25 million subcontract with Schwing to supply and install two wet sludge silos, a dry granules silo (conical silos), two receiving bins, and other associated equipment for the NSSD facility. Pursuant to the terms of the contract with VA Tech, Schwing obtained a performance bond.

Schwing's operations manager, Nancy Predatsch, decided to find a local contractor to fabricate the silos. A

web search turned up IPS, a Wisconsin manufacturer of construction equipment, including standard and custom built bulk material handling equipment. On August 20, 2001, IPS and Schwing executed a purchase order in which, for payment of $666,372, IPS agreed to manufacture and install at the NSSD Waukegan facility the five silos, incorporating the specifications and technical supplies from the VA Tech-Schwing contract.

By attachment, the parties set forth a delivery, installation, and payment schedule. (D. Exh. 1004 at p.4)[1]. According to the delivery schedule, IPS was to deliver all of the silos (the two receiving bins, the two wet storage, and the one dry storage) by December 28, 2001. The installation schedule was labeled "approximate" and noted the following dates:

Two (2) Sliding Frame Silos (Receiving Bin), Approximately February 1, 2002[2]

Two (2) Sliding Frame Silos (Wet Storage), Approximately February 15, 2002

---

[1] Exh. References are to district court trial exhibits; D. Exh. to the defendant, Schwing's exhibits and Pl. Exh. to the plaintiff, IPS's exhibits. Tr. references are to pages in the trial transcript.

[2] The purchase order actually lists these dates as 2001, but it seems clear that this is a scrivener's error and should be 2002. Of course the equipment could not be installed until after it was delivered. Furthermore, when the parties signed the purchase order on September 5, 2001, the February and April 2001 dates would have been nine and four months past, respectively.

One (1) Conical Silo (Dry Storage), Approximately April 15, 2002

*Id.* A note below the schedule states, "[a]ctual schedule will be dictated by progress on the plant construction contract. Installation activity will need to be co-ordinated with the site contractor." *Id.* The delivery schedule contains no such approximate language.

IPS's Executive Vice President, Jordan Kopac, Jr. managed IPS's work directly on site as IPS worked through the late summer and fall 2001. Schwing made progress payments to IPS totaling $595,692.

In November 2001, NSSD decided to suspend work on the project. Consequently, on November 30, 2001, Schwing sent IPS a facsimile directing IPS to cease on-site work, but to continue fabricating the two receiving bin silos at the shop, as scheduled. Schwing also informed IPS that it could continue to deliver materials to the site and unload them, but they should not be fabricated on site. Schwing estimated that the work stoppage would continue for ninety days and asked IPS to inform Schwing of any cost changes associated with the schedule change.

On April 11, 2002, VA Tech inspected IPS's work on the silo parts. Representatives from VA Tech, NSSD, IPS, and Schwing attended the inspection. The next day, a Schwing representative sent out an e-mail identifying fifteen problems with the silos including improper painting and welding. (Pl. Exh. 17). A VA Tech representative also prepared a memorandum noting manufacturing defects , including poor painting and improper

welding. (Pl. Exh. 18). At the time of the memorandum, 90% of the receiving bin silo manufacturing had been completed, as had 50% of the wet sludge silos and 40% of the dried granules silos. Of course, no installation had begun or was yet required. After the inspection, the project lay dormant for approximately two years—until about February 19, 2004, when VA Tech notified Schwing that NSSD had restarted the project at a new site in Zion, Illinois and that VA Tech expected Schwing to honor its contract. VA Tech did not increase its payment to Schwing.

Schwing, in turn, informed IPS that the project was restarting and that Schwing expected IPS to honor its contract. Schwing's project manager asked IPS to inform him of any additional expenses that IPS might incur as a result of the change of location.

IPS responded that a "deep silo fabrication lay-down area"—in layman's terms a work area—would be necessary at the Zion site and would be used to fabricate and store the wet sludge silos on site. It provided two field service quotations for a total of $210,500.

In spring 2004, representatives from Schwing, IPS, VA Tech, and NSSD met to view the project site, coordinate the silo construction site, discuss scheduling, and review potential lay down sites where IPS could work on the silos. Schwing asked IPS's vice president, Kopac, to identify IPS's lay-down area preference and to present Schwing with a proposal for reimbursement of the additional costs for relocating the project and transporting materials.

After the meeting, IPS's Kopac called Schwing's project manager, David Miller once, but did not identify his lay-down area preference. Miller left a number of unreturned messages for Kopac and eventually called IPS's president, Jordan Kopac, Sr., who informed Schwing that IPS would not be participating in the project because the new site was problematic. IPS maintains that had a suitable work area been provided, IPS would have been able to complete the project in three to four months. The new area, however, was a full-blown construction site and IPS believed that the lay down area and roadways were insufficient to complete the project.

Schwing solicited bids from other companies to complete IPS's work, but those bids were high compared to Schwing's contract with VA Tech, factoring in the payments Schwing already had made to IPS. Consequently, Schwing wrote to IPS on June 10, 2004, asking IPS to honor the contract and resume work, or, in the alternative, return all payments it received.

IPS responded that the agreement it had made was for the Waukegan site and not the Zion site, stating further,

> IPS stands ready, willing and able to perform per its contract with Schwing. We are not willing, however, to modify the terms of our contract and commit to the performance at a new site that poses potential pitfalls and complexities that did not exist with respect to the Waukegan site. From a complexity of performance standpoint, the Zion site, being a full-blown construction project, is substantially more complex.

(Pl. Exh. 4).

Notwithstanding IPS's position, Schwing and IPS continued to negotiate. On July 12, 2004, IPS sent a quote to Schwing indicating that for approximately $264,084, it could complete the project at the Zion site. The quote contained three general notes (only note one and two are relevant to this appeal).

GENERAL NOTE #1

Additional costs from the original 2001 job quotation in Waukegan based on an August 2004 start date with the majority of the main & coned silo work expected to be completed by September 30th, 2004.

GENERAL NOTE 3:

IPS has requested and to-date has not received a Zion Project time lines [sic] from Schwing, NSSD or the General Contractor. Therefore IPS will not be responsible for any monetary penalties on this project caused by unrealistic milestones, delays caused by others or acts of God.

(D. Exh. 1012, 1017).

On July 29, 2004, the project manager from Schwing e-mailed IPS's Kopac a proposed change order which included nine additional work items with a proposed additional payment. IPS increased the change order price to $143,630 and noted the outstanding purchase order balance of $99,946, for a total price of $243,576. Kopac quickly sent a return e-mail back to Schwing proposed revisions including that general notes 1-3 of the July 12 quotation be incorporated. IPS also requested a final paragraph that stated:

No other changes to this order apply at this time. Access to silo installation area infrastructure for eventual silo placement into the General Contractor[']s facilities or the use of the General Contractor[']s material handling equipment or requirements for the hiring of General Contractors labor personnel has not yet been established by Schwing America Project Manager and must be established. Additional charges may apply if accessibility is delayed or limited, and charges from the General Contractor or unforeseen issues arise.

The modifications requested by IPS were incorporated into the final change order which was executed on August 12, 2004. (D. Exh. 1017)

That same day, the new Schwing project manager sent Kopac a copy of a "classic layout schedule" common on large construction sites, scheduling activity at the site. The time line contained the following dates:

| activity | early start date | early finish date |
|---|---|---|
| install truck receiving bins | August 11, 2004 | August 12, 2004 |
| install wet sludge silos | December 2, 2004 | December 3, 2004 |
| install dry granules silos | December 6, 2004 | December 10, 2004 |

(D. Exh. 1013)

Schwing made a 30% progress payment of $69,172 on August 9, 2004, and then again on August 24, 2009. IPS installed the two receiving bin silos on September 8, 2004. On September 24, 2004, IPS's Kopac sent Schwing an e-mail stating that NSSD had informed IPS that it wanted the remainder of the silos the first week of October. Kopac told Schwing that this was the first he had heard of this time frame, and that IPS had been planning on delivering the first week of December, referencing the specific lines in the layout schedule which showed a December date for the wet silo installation. On October 29, 2004, IPS sent Schwing an invoice for a 20% progress payment. Schwing called IPS and noted that the underlying work had not been completed. IPS agreed, and thus Schwing withheld the payment.

From this point forward, things began to deteriorate rapidly. Schwing's operations manager began to hear reports that IPS was delaying the NSSD project and that, with only two workers on site, it was not providing adequate staff for the work. VA Tech began calling Schwing, threatening to call Schwing's performance bond because the work was not progressing.

By November 9, 2004, the Zion site was ready for the installation of the two wet sludge silos. IPS indicated that the two wet sludge silos would be installed by December 20, 2004. On December 14, however, Schwing's field project manager received a report of welding defects in IPS's work. On December 22, 2004, Schwing asked IPS to provide a date for installation of the silos. IPS responded that the silos would be on transport trucks by January 21, 2005, and ready for transportation by January 24.

Concerned about the delays, Schwing engaged its former project manager, David Miller, as an outside consultant to go to the Zion work site for two weeks and put matters back on track. Miller testified that the job site was in disarray and chaotic, that the two wet sludge silos were only fifty percent complete, that the dry storage silo had not been assembled, and pieces of it were still at the Waukegan site. He testified further that IPS had sufficient work space. Miller spent some time assisting with welding and fabrication.

While Miller was on site, IPS's Kopac raised concerns that the road was insufficient to transport the wet sludge silos from the lay down area to the building site. Kopac, Miller, and a representative from the general contractor, J.J. Henderson, walked the site, discussed the road conditions, and laid out flags indicating where Kopac wanted the general contractor to place additional gravel. At some point not identified in the record, J.J. Henderson put down the fresh gravel.

On January 25, Schwing paid IPS's outstanding October 29, 2004 invoice. On February 3, IPS sent a revised quotation with a cover note that stated "[t]his covers the eventualities that the delays in preparing the site continue for an unforeseen time" [sic] and proposed additional charges of $43,548.30. Schwing believed that the additional charges were improper because IPS included installation costs which were part of the original purchase order and were not removed in the change order. IPS believed that the change order did not address silo installation at the Zion site and therefore

the purchase order only obligated IPS to install at the Waukegan site.

On the same day that IPS sent the revised quote, Schwing inspected the paint and noticed obvious unpainted stripes of white primer on the undersides of the wet sludge silos where they had been laying on the trailers when they were painted. The inspection also revealed other paint problems. By February 9 e-mail, Schwing advised IPS that it would be liable for any delay until the paint "is within specifications," and advised IPS of other repairs that had to be made.

In a February 11, 2005 letter, Schwing terminated IPS's contract citing delays and the increased costs flowing therefrom. (D. Exh. 1034). The letter noted that the schedule required installation of the wet sludge silos by November 30, 2004, and the dry granules silo by December 2004. *Id.* The letter also stated that IPS's failure to complete the project within the agreed time frame caused delays and thus additional costs to the project for which Schwing would hold IPS liable. *Id.*

Schwing hired J.J. Henderson, Northeast Water Technologies (NWT), and Manta Industrial and Prime Coat Corporation to finish the remaining work. Schwing paid J.J. Henderson $231,515.65 for labor, equipment, and rigging of the wet and dry sludge silos. It paid NWT $87,388.78 to complete fabrication of the dry granules silo and to transport four remaining sections of the roof and other miscellaneous pieces from Waukegan to Zion. Schwing paid Manta $202,730 to sandblast and re-paint the interior of the silos with coal tar epoxy, and paid

$24,826 to Prime Coat to paint the exterior of the three silos. (*See* D. Exh. 1039).

IPS filed suit alleging that Schwing lacked cause for cancelling the contract and that Schwing was liable for IPS's damages. Schwing counterclaimed arguing that it justifiably cancelled the contract after IPS breached and that IPS was liable for damages incurred by Schwing due to IPS's delays and deficient performance.

The action was initially filed by IPS in the Circuit Court for Racine County, Wisconsin but removed to the district court by Schwing as the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. IPS is incorporated in Wisconsin with its principal place of business in Wisconsin and Schwing is incorporated in Minnesota with its principal place of business in Minnesota. *See Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047-1048 (7th Cir. 2007).

After a two-day trial, the district court concluded (1) that Schwing was justified in cancelling the contract after IPS materially breached, (2) Schwing did not breach the contract, and (3) that Schwing sustained damages in the amount of $467,140.02. We affirm in most part and remand for a recalculation of damages.

## II.

The parties dispute the standard by which we review various aspects of this case. "The fixing of the boundary between questions of law and questions of fact, is a matter of federal procedural law and therefore governed by

federal rather than state law in diversity as in other federal suits." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996); *Tax Track Sys. Corp. v. New Investor World, Inc.* 478 F.3d 783, 789 (7th Cir. 2007) (in a diversity suit when the judge acts as a fact finder the federal standard of review applies). Although the interpretation of an established written contract is generally a question of law for the court (*Holmes v. Potter*, 552 F.3d 536, 538 (7th Cir. 2008), the question of whether or not a particular breach of a contract is material is a question of fact. *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 544 (7th Cir. 2003). Thus, we interpret the contract de novo but review the district court's determination of whether IPS materially breached the contract for clear error. *See United States v. Lake*, 500 F.3d 629, 632 (7th Cir. 2007) (questions of law reviewed de novo; findings of fact for clear error).

### A.  Breach of Contract

The district court concluded, and the parties do not contest, that Wisconsin law applies to the agreement in this case. Under Wisconsin law, a material breach of contract releases the non-breaching party from performance of the contract. *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 77 (Wis. 1996). A breach is material if it destroys the essential object of the agreement or deprives the non-breaching party of a benefit that the party reasonably expected. *Ranes v. Am. Family Mut. Ins. Co.*, 580 N.W.2d 197, 200 (Wis. 1998); *Mgmt. Computer Servs., Inc.*, 557 N.W.2d at 77-78. In this

case, Schwing terminated the contract due to IPS's failure to complete work satisfactorily within particular time frames. Consequently, the district court's task was to determine whether fabrication and installation by a particular date was a benefit that Schwing reasonably expected and whether the delays and the claimed defects in performance destroyed the essential object of the contract.

The first step in such a determination is identifying the contract and what it required. The district court determined that the September 5, 2001 purchase order, and the August 12, 2004 change order together formed the contract between the parties. (R. 32 at p.23). The question before this court is interpreting what, if anything, those orders say about performance standards and deadlines.

When a contract is silent on the time for performance, a reasonable time is implied. *Delap v. Inst. of Am., Inc.,* 143 N.W.2d 476, 478 (Wis. 1966); Wis. Stat. § 402.309(1). IPS argues that the contract here was such a "reasonable time" contract. We think the better interpretation is that the contract did indeed set forth specific dates for performance. As we ultimately conclude, however, whether the contract was one demanding performance within "a reasonable time," or by a date certain, IPS failed to meet the requirement.

The original 2001 purchase order clearly identified a time frame for performance, requiring delivery by December 28, 2001, and installation by the approximate dates of February 1, 2002, for the two receiving bins, February 15

for the two wet storage silos, and April 15 for the dry storage bins. (D. Exh. 1004, Attachment A at p.4). Of course, these dates were later modified by the parties; first, by a November 30, 2001 fax, in which Schwing directed IPS to continue shop fabrication, but to cease on-site fabrication until further notice (D. Exh. 1005), and later by the August 12, 2004 change order (to which we will turn our attention momentarily). These initial dates indicate that Schwing and IPS had a meeting of the minds that the project would be completed within a particular time frame—an approximately eight-month period, with installation occurring just one month from the delivery date for receiving bins, forty-nine days from delivery for the wet sludge silos, and three-and-a-half months from delivery for the dry granules silo. In sum, the initial contract contemplated a short time frame and a quick turn around time from delivery to installation.

Nothing in the language of the change order alters those expectations or modifies the contract from one requiring specific dates to one requiring only a reasonable time for performance. In fact, the change order specifically states that other than the changes specifically iterated in the change order, "no other changes to this order apply." (D. Exh. 1017 at p.2). We know, of course, that it was the intent of the parties to alter the delivery and installation dates from the original purchase order. Clearly, Schwing altered the contract deadlines when it sent the fax directing IPS to cease all on-site fabrication as of November 30, 2001, and later when it agreed to a change order. To what date, then, did the parties alter the original deadlines?

General Note One to the change order states that "the majority of the main & coned silo work [is] expected to be completed by September 30th, 2004." (D. Exh. 1017, 1012)[3]. The main silo work refers to the wet sludge silos and the coned silo refers to the dry granules silos (*see* D. Exh. 1004), thus leaving only a smaller project—the truck receiving bins—to complete after September 30, 2004[4]. In fact, the receiving bins were installed on September 8, 2004, well before the September 30 deadline. This express language sets forth some clear expectations regarding timing. September 30 came and went without completion of the majority of the main and coned silo work.

Not even Schwing, however, seems to be arguing that IPS breached by missing the September 30, 2004 deadline from the change order. Schwing argues instead that the new deadlines came from the layout schedule—an eight-page, 399-line spreadsheet used to coordinate all of the projects on the site. General Note Three to the change order states, "IPS has requested and to-date has not received a Zion Project time lines [sic] from Schwing, NSSD or the General Contractor. Therefore IPS will not be

---

[3] The change order (D. Exh. 1017) incorporated by reference three general notes from IPS estimate #1520 (D. Exh. 1012), drafted by IPS.

[4] The initial purchase order contemplated delivery of all of the parts on December 28, 2001, and installation of the truck receiving bins just a mere 31 days later, so we may assume that this was the fastest of the projects.

responsible for any monetary penalties on this project caused by unrealistic milestones, delays caused by others or acts of God." (D. Exh. 1017 at p.2; Exh. 1012 at p.4). This language contemplates that the timelines will be guided by the layout schedule. In fact, IPS's language indicates that without such a timeline, "all bets are off." Clearly this is not a contract that anticipated that the parties would perform in a "reasonable time." The project at hand was complex and involved coordination of many different subcontractors. The layout schedule contained approximately 400 lines of activities that were to be completed over the course of eighteen months—each activity carefully scheduled to coordinate with the project as a whole. Even IPS relied upon the layout schedule for its deadlines. IPS's senior vice president stated in an e-mail to Schwing, "They are actually looking for the remainder of the silos in the first week of October. This is also the first I have heard this and was planning/scheduling to be ready the first week in December [as described in the attached layout schedule] Line #s 1810 and 1990." (D. Exh. 1022). In sum, this appears to be a contract containing specific deadlines and one that was referring to the layout schedule to provide them.

In arguing that the layout schedule did not establish deadlines, IPS raises some noteworthy points. First, IPS argues that the parties could not have intended to incorporate some of the layout schedule deadlines in their contract. For example, the layout schedule states an early finish date of August 12, 2004 for installation of the truck receiving bins. The parties, however, did not execute the

change order until August 12, 2004. IPS argues that it certainly did not intend to execute a contract that it was in breach of before it had any opportunity to perform. IPS, however, puts too fine a point on these exact dates. After the lengthy delay while the project sat on hold, and after some mildly contentious correspondence, on July 10, 2004, the parties began negotiating to resume the project under revised terms. On July 12, 2004, IPS sent Schwing a Field Service Quotation which eventually led to the final change order which the parties signed on August 12, 2004. On July 12, when Schwing drafted the field service quotation that would become the final change order, the August 12 deadline certainly was feasible. It is quite possible that the parties contemplated beginning work or perhaps did begin work before the ultimate change order agreement was finalized and signed. In fact, the receiving bins were installed on September 8, only twenty-seven days after the parties signed the change order. Moreover, the fact that some of the dates were either unrealistic or inaccurate does not eviscerate the import of the general framework of the layout schedule to the project. Of course, as IPS points out, one expects some amount of delay and revision in the scheduling of construction projects. And although "[w]hen performance is due . . . anything short of full performance is a breach" (*Steele v. Pacesetter Motor Cars, Inc.*, 672 N.W.2d 141, 144 (Wis. Ct. App. 2003) (internal citations omitted)), a relatively minor breach does not excuse the other party from its contractual performance. *Mgmt Comp.*, 557 N.W.2d at 77-78.

Even if we were to determine that the parties did not intend to incorporate the layout schedule into the contract, we would arrive at the same conclusion regarding the question of a material breach. If the contract contained no time for performance, the law will imply a reasonable time. *Delap,* 143 N.W.2d at 478. What constitutes a reasonable time for performance given the facts of the case is again a question of fact to which we defer to the district court. *Klockner, Inc. v. Fed. Wire Mill Corp.*, 663 F.2d 1370, 1380 (7th Cir. 1981). And how would a court determine what a reasonable time for performance is in a complex construction project such as this? The logical place to begin is by looking at the highly detailed document that sets forth all of the various time frames for the project—the layout schedule. It is true, as IPS points out, that the layout schedule speaks not of deadlines, but of "early start" and "early finish" dates. Once again, however, the layout schedule is the beginning, and not the end of the consideration. In determining materiality of breach and the parties' reasonable expectations, a court would look not only at the construction schedule, but would also consider the circumstances as a whole, bearing in mind normal delays of construction, whether Schwing or other contractors or subcontractors bore responsibility for the delays, and the benefit Schwing could reasonably expect. In short, whether we conclude, as the district court did, that the layout schedule was part of the contract, or whether we find that IPS had a "reasonable time" to perform, the determination of whether IPS materially breached the contract must be made by looking initially to the time frames set forth in the purchase orders and layout schedule.

The district court found that IPS had materially breached the terms of the contract and the record certainly supports such a determination. The original purchase order required delivery less than five months from the date the order was signed and then anticipated approximate installation dates one month from the delivery date for the receiving bins, forty-nine days from delivery for the wet storage silos, and three-and-a-half months from delivery for the dry storage bin (conical silos). The notice to cease work at the site specifically instructed IPS to continue shop fabrication. Thus, by the time the change order negotiations occurred in July and August 2004, a significant amount of work had or should have already occurred in the shop. It was not unreasonable, therefore, for the contract to contemplate "an August 2004 start date with the majority of the main & coned silo work expected to be completed by September 30th, 2004," as stated in General Note One. (D. Exh. 1012 at p.4). Nor was it unreasonable for the agreement (via the layout schedule) to contemplate installation of the wet and dry storage silos by the even later dates in early December. (D. Exh. 1013, line 1810 and 1990). Of course, IPS argued that the new site presented far greater logistical challenges than the previous site. Even so, as of February 11, 2005, long after any of the contemplated due dates, the project had not been completed. The district court did not err by determining that IPS materially breached the contract by failing to meet Schwing's reasonable expectations.

Nor did the district court err in finding that IPS's reliance upon an allegedly insufficient lay-down area as an excuse for its delayed performance was not con-

sistent with the evidence. The district court determined that persuasive, overwhelming, and credible evidence established that the Zion site provided sufficient space and roads for IPS to complete its work, and that IPS did not devote a sufficient number of workers to the project.

Finally, we need not address IPS's argument that expert testimony as to "reasonable time" was required, as that argument was waived when IPS failed to raise it in the district court. *See Skywalker Communications of Ind., Inc. v. Skywalker Communications, Inc.*, 333 F.3d 829, 831 (7th Cir. 2003).

## B.  Damages

Having determined both that IPS materially breached the agreement, and that the breach damaged Schwing, the district court turned to its calculation of damages. We review the calculation of an award of damages for clear error *(Trs. of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.*, 493 F.3d 782, 789 (7th Cir. 2007)), but review the propriety of awarding damages de novo. *See Morley-Murphy Co. v. Zenith Elec. Corp.,* 142 F.3d 373, 378 (7th Cir. 1998).

The district court determined that Schwing was entitled to damages to compensate it for losses it incurred by IPS's breach. In a breach of contract action, the fundamental idea is to put the injured party in as satisfactory a position as the party would have been in had the contract been performed. *Thorp Sales Corp. v. Gyuro*

*Grading Co.*, 331 N.W.2d 342, 346 (Wis. 1983). Once the district court concluded that IPS breached, it properly determined that Schwing was entitled to damages to rectify the loss.

IPS objects to the district court's characterization of the damages as "incidental damages." *See* (R. 32 at p.31). The district court noted that they could also be characterized as "cover." *Id.* We need not quibble over the terms. Provided Schwing properly mitigated its damages as required, it is entitled to be placed in the position it would have been had IPS properly performed. (*Peterson v. Cornerstone Prop. Dev., LLC*, 720 N.W.2d 716, 731 (Wis. App. 2006)). Under that general concept, the injured party is entitled to damages that flow directly and necessarily from the breach of contract, and that were reasonably foreseeable to or contemplated by the parties at the time the contract was made. *Id.* at 730. A party is not entitled, however, to be placed in a better position than it would have been if the contract had been performed. *Id.* Our task then, is to determine whether the district court clearly erred in calculating which payments were necessary to put Schwing in the position it would have been in had IPS performed, allowing for reasonably foreseeable additional damages, but ensuring that Schwing did not come out ahead.

1. *Silo installation*

IPS argues first that it had no obligation to install silos at the Zion site, claiming that, because IPS did not have

available sufficient information to quote installation costs at the time it signed the change order, the change order did not address silo installation at all. The district court did not address the matter directly, but by allowing damages for silo installation, inherently found that the contract obligated IPS to install the silos at the Zion site. The interpretation of an established written contract is generally a question of law for the court, and thus we review this question de novo. *Holmes v. Potter*, 552 F.3d 536, 538 (7th Cir. 2008).

IPS argues that the final paragraph of the change order indicates that "issues relating to silo area infrastructure access, material handling equipment and labor requirements had not been established at the time the order was signed." IPS Brief at 21. That final paragraph of the change order states:

> No other changes to this order apply at this time. Access to silo installation area infrastructure for eventual silo placement into the General Contractors facilities or the use of General Contractors material handling equipment or requirements for the hiring of General Contractor labor personnel has not yet been established by Schwing America Project Manager and must be established. Additional charges may apply if accessibility is delayed or limited, and charges from the General Contractor or unforeseen issues arise.

(D. Exh. 1017 at p.2). Under the plain language of this paragraph, the parties anticipated that IPS would install the silo at the Zion site and that additional charges might apply, but only if IPS's access to the site was

delayed or limited or other unforeseen issues arose. The only unresolved installation issues, therefore, were questions regarding access to the site, use of the general contractor's materials and labor, and possible unforeseen issues. The final note assumes that the contract covers installation at the Zion site.

IPS's vice president Kopac testified that installation was not included in the change order. Schwing's operations manager, Predatsch, testified to the contrary. Although the district court did not make an explicit factual finding, by granting Schwing damages for silo installation, it determined that the change order included installation of the silos at the Zion site. Such a determination makes sense to the narrative of this case. Recall that after Schwing asked IPS to honor the original agreement, IPS responded that the agreement it had made was for the Waukegan site and not the Zion site. Negotiations continued and after several exchanges, the parties signed the change order and IPS resumed its work at the Zion site. Not only does the plain language of the change order demonstrate an agreement to install at the Zion site, but the parties' actions demonstrate an agreement that IPS would continue performing and install the silos at the Zion site.

2.  *Painting and coating*

Each party in this case presented evidence regarding the sufficiency of the coating and painting of the silos, both inside and out. After hearing the evidence, the district court determined that Schwing had met its burden of

proving damages attributable to IPS's breach of performance. Our review of the record reveals no clear error. *See, e.g.*, D. Exhs. 1027, 1032, 1033, 1042; Tr. pps. 138-39, 155, 233-35, 237, 247-48, 255-56, 259-62, 275). IPS argues that Schwing failed to prove that the drips and runs, which are obvious from photographic and documentary evidence in the record, were not permitted by the contract specifications, and did not require complete re-coating as a remedy. The district court, in awarding damages for re-coating, disagreed and the record supports such a conclusion. *See id.* IPS also argues that IPS remedied the paint thickness problem by re-coating the silos prior to termination. The district court was well within its bounds to determine that this eve-of-termination remedy either came too late or was insufficient to resolve the problem. Nevertheless, even if the coat thickness had been resolved, the drips and runs had not, and the district court did not clearly err by determining that Schwing was entitled to re-paint.

3.   *The warranty*

IPS further claims that Schwing waived any claim for defective workmanship by failing to present a warranty claim to IPS as IPS claims was required by the contract. Paragraph K of the contract stated,

> K. Warranty: One year parts and labor. One year commences upon acceptance by owner. I.P.S. shall be responsible for replacement or repair resulting from defective workmanship or non-conformance to Schwing-furnished designs, approved shop drawings

> or standard fabrication procedures. Warranty is to
> be performed by I.P.S. others authorized by I.P.S.

(D. Exh. 1004).

In short, IPS argues that Schwing had a contractual duty to give IPS the first stab at repairing any defects or damage. The parties engage in much back and forth over whether either of the parties waived this issue by failing to raise it below. IPS raised it below, at least nominally, by claiming in its post-trial brief that "Schwing is not entitled to any damages because . . . it did not comply with the requirements of paragraph K of Attachment A to the original purchase order which required that any warranty claim work be performed by IPS." (R. at 24 at p.8). *See Oscar Gruss and Son v. First State Bank of Eldorado*, 582 F.2d 424, 433 (7th Cir. 1978) (noting without discussing that a party had raised a claim below by asserting it in a post-trial brief); *See also Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1087 (5th Cir. 1996) ("an issue first presented to the district court in a post-trial brief is properly raised below when the district court exercises its discretion to consider the issue"). IPS did not discuss the issue further, but nevertheless, the statement is clear, albeit perfunctory, in its claim. Not surprisingly, Schwing failed to reply to this needle of a claim hidden in a haystack of issues in this case. It is also not surprising because each party filed its post-trial brief on the same day, limiting the opportunity of both parties to respond. Of course, a party may always move a court for the opportunity to reply (s*ee, e.g., Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998) (allowing party to file an additional brief where opposing party articulated

new theory)), but because the argument was so trun-cated, Schwing may not have identified it as a new or separate argument.

In any event, there is no question that, at trial, the parties had the opportunity to present evidence as to whether IPS had a fair chance to correct defects or damage, and the district court considered this matter in the course of arriving at its holding. The district court noted that Schwing gave notice of its dissatisfaction with IPS's work by its repeated requests for an installation date for the wet sludge silos and its complaints about the painting and welding of the silos. (R. at 32 at p.27). *See also* (D. Exhs. 1027, 1029, 1032, 1033, 1043) (Tr. pps. 72, 123-124, 132-145, 207-209, 233-235, 251, 253-55, 274). The district court did not err by determining that this was sufficient notice to IPS of Schwing's dissatisfaction.

IPS argues, in the alternative, that Schwing com-plained only of drips and runs and the thickness of the exterior shell coatings on the wet sludge silos and that, even if it did give sufficient notice for these items, such notice did not relieve Schwing of the duty to tender warranty claims for other work before contracting with others. The district court concluded, however, that Schwing gave IPS sufficient notice of its dissatisfaction, not only with the quality of the work, but also with IPS's tardiness in completing the project. It was this failure to perform on both fronts—timeliness and quality—that allowed Schwing to repudiate the contract and mitigate its damages by retaining other companies to either com-plete the unfinished work or redo the non-conforming work as appropriate. *(See* R. at 32 at p.27).

4. *Amount of damages*

As to the amount of damages, a matter we review for clear error (*Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 461 (7th Cir. 2006)), we agree with the district court's assessment that Schwing met its burden of proving to a reasonable degree of certainty that the following damages were attributable to IPS's breach:

(1) $68,500.00 to Northeast Water Technologies (NWT) for completion of fabrication work (March 5, 2005);

(2) $75,250.00 to J.J. Henderson for labor, equipment, and rigging of the wet sludge silos into place. (February 14, 2005);

(3) $45,054.00 to J.J. Henderson for labor, equipment, and rigging of the dry granules silo into place (May 10, 2005);

(4) $18,888.78 to NWT for documented additional work items including meetings, inspections, repairing manufacturing defects, and supplies (September 1, 2005);

(5) $13,891.32 to J.J. Henderson (December 19, 2005)[5];

(6) $42,826.02 to Prime Coat for painting the exteriors of two wet sludge silos and the dry granules silo (December 28, 2005); and

---

[5] These numbers differ from Schwing's charges incurred (see infra at section I and D. Exh. at 1039), as not all of the payments to J.J. Henderson were attributable to IPS's breach (*see* Tr. at 156-58).

(7) $202,730.00 to Manta for repainting the interior of the two wet sludge silos and the dry granules silo with coal tar epoxy (December 20, 2005).

(R. at 32 at p.33) (*see also* D. Exh. 1044).

We do, however, find one small error. At the time of the breach, Schwing had not yet paid IPS $46,116 dollars that would have been owed had IPS completed the contract. By failing to deduct this money from the damage award, Schwing was placed in a better position than it would have been in had IPS performed. Schwing received damages to cover its costs for completing the work, but also was absolved of its requirement to pay the remaining $46,116 of the contract. In essence, Schwing was rewarded twice for the breach. Schwing is incorrect that IPS waived this argument. In its post-trial brief to the district court, IPS argued that the damage "sum must be reduced by $46,114, the final 20% installment under the change order that Schwing did not pay." (R. at 24 at p.9). IPS raised the issue and identified the amount at pages 12 and 30 of its brief before this court. Apparently, Schwing agrees that the unpaid balance of the change order amounted to $46,116, and argues only that IPS waived the argument (a contention we just debunked) or that, in some nebulous way, the trial court's findings were plausible in light of the record and should be affirmed.[6] We remand for the limited purposes of

---

[6] In calculating the amount of the unpaid balance of the change order, Schwing twice correctly calculates the number as $46,116.

(continued...)

deducting this $46,116 unpaid balance from the total damage award calculated by the district court.

Finally, the district court concluded that Schwing owed IPS $2,000 for moving two power pacs from Waukegan to Zion. The district court concluded that the work was not part of the parties' contract, but based on Schwing's stipulation at trial that $2,000 in compensation for these services was acceptable, the district court concluded that Schwing should reimburse IPS for these costs. IPS seems to have viewed this concession as an opportunity to get the rest of the camel under the tent. Toward that end, it argues not just that Schwing and IPS had a separate agreement to transport two power pacs from Waukegan to Zion, but that the parties had an entire oral contract regarding installation of the silos (a matter, we have already concluded was included in the written contract). The existence of an oral agreement is a question of fact that warrants deference to the district court. *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 369 (7th Cir. 1998). In this case, the district court determined (largely because of Schwing's agent's concession at trial) that the parties had a separate agreement for "mobilization of two power pacs from Waukegan to Zion," but not, as IPS states, that they had an agreement for all of the

---

[6] (...continued)

*See* Schwing brief at 35, n.12. In a parenthetical explaining the calculations, however, Schwing mis-typed that number as $44,166. According to both Schwing and IPS's calculations, the correct number is $46,116.

costs IPS would incur in assisting Schwing's installation of silos at the Zion site.

For the foregoing reasons, the district court is AFFIRMED in part, and REVERSED in part with instructions to correct damages in a manner consistent with this opinion. IPS shall bear the cost of this appeal.