COURT OF APPEALS
DECISION
DATED AND FILED

April 2, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP822**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV5309

IN COURT OF APPEALS
DISTRICT I

---

ACUITY, A MUTUAL INSURANCE COMPANY,

PLAINTIFF-APPELLANT,

CRYSTAL TRUETTNER,

INTERVENOR-PLAINTIFF-APPELLANT,

V.

JM REMODELING & CONSTRUCTION AND FRANKENMUTH MUTUAL INSURANCE COMPANY,

DEFENDANTS-RESPONDENTS,

MIKE MOON AND ABC INSURANCE COMPANY,

DEFENDANTS.

---

APPEAL from an order of the circuit court for Milwaukee County: WILLIAM SOSNAY, Judge. *Affirmed in part; reversed in part and cause remanded with directions*.

Before White, C.J., Colón, P.J., and Donald, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Acuity, a Mutual Insurance Company, and Crystal Truettner appeal from the circuit court order dismissing their negligence and breach of contract claims arising from an apartment fire and granting summary judgment to JM Remodeling & Construction and Frankenmuth Mutual Insurance Company (collectively JM Remodeling).[1] Acuity insured an apartment building on West Loomis Road (the "Apartment Building"), which was owned by 4340 W. Loomis Road, LLC ("4340 LLC"). Acuity alleged that 4340 LLC contracted with JM Remodeling to renovate the Apartment Building. Co-defendant Mike Moon, JM Remodeling's employee or subcontractor, repaired a leaky pipe in the bathroom of Unit 15, after which a fire broke out, causing substantial damage. Acuity brings its claims under subrogation rights arising from payments it made to its insured, 4340 LLC. Truettner intervened in Acuity's action as a residential tenant under lease in the Apartment Building at the time of the fire; however, she is not alleged to be a tenant in Unit 15.

---

[1] Crystal Truettner's intervenor complaint alleged the fire caused destruction of her personal property; she asserted damages of over $6,000. Throughout the litigation, Truettner stated her interests were completely aligned with Acuity. She did not file an independent response to JM Remodeling's motion for summary judgment or an independent brief in this appeal. Nonetheless, she was included in the notice of appeal and is an appellant in this matter.

¶2      For the reasons discussed below, we conclude that genuine issues of material fact preclude summary judgment on Acuity's negligence and breach of contract claims.    While the same issues preclude summary judgment on Truettner's negligence claim, we conclude that she has forfeited the breach of contract claim by failing to argue the contract claim before the circuit court. Therefore, we affirm the part of the circuit court order dismissing Truettner's contract claim.  We reverse the remainder of the order, including both of Acuity's claims and Truettner's negligence claim, and remand for further proceedings consistent with this decision.

## BACKGROUND

¶3      This case arises from a fire on April 20, 2020, at the Apartment Building.  Acuity filed an action for (1) negligence and breach of contract against JM Remodeling and (2) negligence against Moon.  Acuity named Michael Quick, a Fire Origin and Cause Investigator, from Kubitz & Associates, as an expert witness and proffered his report of his investigation and analysis.  Quick visited the Apartment Building the day after the fire, interviewed Moon, and photographed the tools he used to repair the leaking copper pipe, which included a soldering kit with a gas torch.  Quick reported that Moon wrapped the pipe with an Oatey Flame Protector 9" x 12" heat shield fire blanket, which was rated effective up to 2,500 degrees.  However, that rating was lower than the maximum in-air flame temperature of the BernzOmatic MAP-Pro gas torch used by Moon to solder the pipes; the torch could reach temperatures up to 3,730 degrees Fahrenheit.  In Quick's expert opinion, the most probable cause of the fire was an ignition of nearby combustible materials when the torch was used to solder the pipe.  Acuity stated that it paid more than $892,000 in claims to 4340 LLC as a result of this fire.

3

¶4 JM Remodeling moved for summary judgment. While Acuity alleged that JM Remodeling was liable for Moon's negligence under respondeat superior, JM Remodeling argued that Moon's negligence was not proven, and asserted Moon was an independent contractor, which meant that JM Remodeling was not liable for his torts. Acuity alleged that if Moon were an independent contractor, JM Remodeling, as the general contractor of the renovations, was still liable under contract law. It argued that JM Remodeling performed work for 4340 LLC under an implied contract containing a common law duty to perform the repair work with skill and care, and JM Remodeling breached that contract and duty, causing the fire at the Apartment Building through its subcontractor, Moon. JM Remodeling denied there was an express or implied contract.

¶5 Accompanying the summary judgment briefing were depositions from Moon; Jim Meldman, the owner of JM Remodeling; Heather Henn, the manager of JM Remodeling; affidavits from Quick and JM Remodeling's accountant; and copies of the Greenfield Police Department reports regarding the fire. We recite the facts presented.

¶6 Meldman was the owner of multiple residential and commercial properties, each legally owned by a separate LLC, including 4340 LLC; JM Remodeling, a design and build firm; and a holding company for projects in development. Henn stated that she managed day-to-day operations. Meldman stated that his companies used independent contractors, such as architects, designers, and engineers, who were paid with 1099 independent contractor tax forms. The independent contractors were paid directly by the LLCs, not through JM Remodeling.

¶7      Henn testified that she developed the scope of repair, remodeling, or maintenance work to be done by JM Remodeling and assigned it. Meldman testified that only Henn knew how projects were assigned, whether as work directly by JM Remodeling or bid to third parties. Neither Henn nor Meldman could state what percentage of work JM Remodeling did for properties owned by Meldman versus third parties. When JM Remodeling worked on property owned by Meldman, the specific building LLC was billed for any work completed by JM Remodeling, but Henn testified that there were no contracts for work between any of the LLCs and JM Remodeling.

¶8      Both Meldman and Henn testified that Moon was an independent contractor who did some minor or light maintenance work. Moon testified that he thought he was an employee; he worked exclusively for JM Remodeling during this time, working every weekday for 6-10 hours a day. Moon stated that he did not have a company or other clients. He normally was given tasks and projects by text or phone call from Henn or a secretary. He tracked his hours by the building where the work was completed and Henn paid him in cash every other week, until the fire.

¶9      Meldman, Henn, and Moon, all reviewed and did not dispute the accuracy of a QuickBooks accounting report of payments to Moon from May 2020 to December 2021; the sum was $45,000. There were no entries for payments before the fire on April 20, 2020. Henn stated that JM Remodeling began using a new labor tracking and billing system after the fire, and she recalled not giving Moon work after the fire. JM Remodeling's accountant attested that Moon was not an employee, and had been paid as an independent contractor, producing 1099 tax forms for 2020 and 2021. However, Moon stated he did not know how the taxes were handled, but he did not report his cash earnings. While Moon stated

5

that he thought he was an employee, he acknowledged he did not receive a W-2, benefits, or overtime.

¶10    Moon testified that he supervised himself, he "fixed whatever needed fixing[.]"  While he held a journeyman's electrician's license, he did not have a plumber's license, which JM Remodeling knew because he told the staff he was unable to pull a permit.  Henn testified that she did not know Moon's credentials.  Moon stated that he began working for JM Remodeling in about June 2019, and stopped around January 2021, later clarifying that the work stopped when this lawsuit was filed.  Prior to the fire, he did not have insurance.  After the fire, JM Remodeling required him to have insurance.  Previously, he had done maintenance, plumbing, and electrical, for many different property owners on the East side of Milwaukee, typically paid in cash, although with a W-2 for one owner.

¶11    Moon testified that on the day of the fire, Henn sent him to do work on another Meldman-owned building, when he was contacted about a leaking pipe in Unit 15 of the Apartment Building.  Unit 15 was empty, which, in Moon's experience, was typically when units were renovated, and the whole shower and tub were being replaced.  He stated that a JM Remodeling employee cut open a wall with a reciprocating saw, exposing electrical wires, gas lines, and plumbing lines.

¶12    To repair the leak, Moon brought a copper pipe repair kit, sprayers, and soldering equipment.  His testimony and the police report described Moon's account of the repair in a similar manner.  Moon sprayed the insulation in the wall with water and wrapped the pipe in a fire blanket to prevent any fires.  He then used a propane torch to solder a coupling on the copper pipe to stop the leak.

Moon then sprayed the area again, felt the wall to make sure it was not warm, and stuck his arm up the wall to make sure it was wet. After checking the repair, Moon left. Moon estimated that the repair took about 10 minutes and he was there about 30 minutes in all; the police report stated he arrived at 10 a.m. and left at 11 a.m. Shortly after leaving, a JM Remodeling employee notified him by phone that the Apartment Building was on fire and he returned. Henn testified that she was not aware of how or when Moon was asked to fix the pipe or was informed about the fire.

¶13 Moon reviewed the police report; he did not dispute the reporting that: "Moon stated right away that it was possible that a piece of solder or a spark had got up into the wall that he was working on and had started a fire." According to the police report, after the fire was extinguished, a firefighter showed the investigators "that the fire was concentrated in the bathroom [and] one of the pipes in the wall was glowing red." Analyzing the burn pattern, the fire travelled up the bathroom wall into the roof. Although the report stated that the investigators "believed that the fire was accidental, the cause and origin of this fire are officially undetermined." The investigators believed it was "caused by the remodeling and utilization of the soldering gun."

¶14 The circuit court gave an oral ruling on the summary judgment motion on October 18, 2023. The court reviewed the facts presented by the parties and the timeline of Moon using soldering tools to fix a leaking pipe, noting the precautions Moon took to use a sprayer to wet the repair site, apply a fire blanket, and monitor for potential sparks. The court noted that while Moon believed his work did not cause the fire, he acknowledged it was possible.

¶15     The court then addressed Moon's employment status, concluding that he routinely performed maintenance work like this plumbing job, he received assignments through contacts at JM Remodeling, and he "independently perform[ed] maintenance work without supervision."  Moon submitted his time and was "paid cash for his services.  And he was issued a 1099 form for tax purposes."  The court noted that "[s]ubsequent to the fire at some point apparently, JM [Remodeling] did not use Mr. Moon after that."

¶16     The court concluded that Moon was an independent contractor, not a servant, and the doctrine of respondeat superior did not apply.  The court reviewed the factors it considered, including control or right to control the work, "the place of work, the time of the employment, the method of payment, the nature of the business or occupation, which party furnishes the instrumentalities or tools, the intent of the parties to the contract , and the right of summary discharge of employees," citing *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 199-200, 423 N.W.2d 848 (1988).  The court then applied the factors to the facts presented and concluded that "[c]ontrol or the right to control" was not present in the record.  The court concluded that JM Remodeling told Moon what repairs needed to be done, but did not supervise his conduct and he had discretion over the work.  JM Remodeling did not provide any tools.  The court concluded that Moon was not a servant of JM Remodeling.

¶17     The court granted partial summary judgment to JM Remodeling and dismissed the negligence claim against it.  At a second hearing in February 2024, the court considered the breach of contract claim.  Acuity argued that under the general contractor rule, when an independent contractor negligently performs work under a general contractor, the general contractor may be liable to the

property owner for breach of a contractual duty of care, even if the contract was implied and not express.

¶18    The court noted that Meldman owned both JM Remodeling and 4340 LLC and Meldman was not moving to enforce JM Remodeling's duty under the contract, as Acuity argued should happen.  The court questioned Acuity's standing to enforce the contract even with subrogation rights, as it was not a party to the contract.  Acuity argued that it was not attempting to enforce a contract, it was asserting that a contract existed under which Moon was then engaged as a subcontractor and Acuity had the right to pursue both Moon and JM Remodeling for Moon's negligence.

¶19    The circuit court concluded that there was no intent by either 4340 LLC or JM Remodeling to enter into a contract, noting that an implied contract is determined by the conduct of the parties and here, it was Acuity arguing it existed, not 4340 LLC or JM Remodeling, which both denied it.  The court granted full summary judgment in JM Remodeling's favor.[2]  Acuity and Truettner appeal.[3]

---

[2] In the final order, the claims against JM Remodeling were dismissed in their entirety, with prejudice, and on the merits; however, the claims against Moon would proceed pursuant to the scheduling order.

[3] While JM Remodeling does not dispute that Truettner's claims aligned with Acuity, we note that Acuity does not claim to represent Truettner.  For ease of reading, we generally refer to Acuity alone as it was the active litigant and appellant.  We address Truettner's claims in section III, after Acuity's claims.

**DISCUSSION**

¶20 Acuity argues that genuine issues of material fact preclude summary judgment. It argues that the facts present a reasonable inference that Moon was a servant of JM Remodeling and therefore JM Remodeling would be liable for his negligence. Acuity also argues that under its subrogation rights created by the claim payment, it can step into 4340 LLC's role in an implied contract with JM Remodeling to allow Acuity to pursue JM Remodeling for breach of contract for Moon's work, as subcontractor on the implied contract, if Moon were considered an independent contractor. We conclude that genuine issues of material fact preclude summary judgment on both claims for Acuity. We address Acuity's claims in turn, and then we address the effect of those conclusions on Truettner's claims.

¶21 A circuit court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," show that there are no genuine issues of material fact, and "the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2023-24).[4] We independently review whether the circuit court correctly granted summary judgment. *Munger v. Seehafer*, 2016 WI App 89, ¶46, 372 Wis. 2d 749, 890 N.W.2d 22. "When deciding whether there are genuine issues of material fact, we view the evidence, and the reasonable inferences from that evidence, in a light most favorable to the nonmoving party." *Petzel v. Valley Orthopedics Ltd.*, 2009 WI App 106, ¶5, 320 Wis. 2d 621, 770 N.W.2d 787.

---

[4] All references to the Wisconsin Statutes are to the 2023-24 version.

### I.    *Negligence through respondeat superior*

¶22    "It is a basic principle of law, as well as common sense, that one is typically liable only for his or her own acts, not the acts of others." ***Lewis v. Physicians Ins. Co. of Wis.***, 2001 WI 60, ¶11, 243 Wis. 2d 648, 627 N.W.2d 484. However, an exception is the doctrine of respondeat superior, which imposes responsibility by "virtue of the close relationship between that person and the tortfeasor." ***Kerl v. Dennis Rasmussen, Inc.***, 2004 WI 86, ¶¶17, 22, 273 Wis. 2d 106, 682 N.W.2d 328. Under the doctrine, "a master can be held liable for the physical harm caused to third persons by the torts of his [or her] servant." ***Arsand v. City of Franklin***, 83 Wis. 2d 40, 45, 264 N.W.2d 579 (1978).[5] "The master/servant relationship is a species of agency; all servants are agents but not every agent is a servant." ***Kerl***, 273 Wis. 2d 106, ¶20.

¶23    "The right to control is the dominant test in determining whether an individual is a servant." ***Pamperin***, 144 Wis. 2d at 199. Other factors may be considered including where the work is completed, the worker's time in employment, method of payment, the nature or type of work, who provides the tools to complete the work, and the intent of the parties. ***Id.*** at 199. There need not be a formal contract of employment or even payment for the work for a person "to occupy the position of servant." ***Kerl***, 273 Wis. 2d 106, ¶22. Servants are distinguished from independent contractors, a term that encompasses both agents

---

[5] Although typically "employer and employee" or "principal and agent" would suffice to explain the relationship between two parties, the use of the terms master and servant under "[t]he doctrine of respondeat superior ('let the master answer')," reflects its use in agency law "for perhaps as long as 250 years." ***Kerl v. Dennis Rasmussen, Inc.***, 2004 WI 86, ¶17, 273 Wis. 2d 106, 682 N.W.2d 328.

who do not satisfy the test for servants and those who are not agents at all.[6] *Arsand*, 83 Wis. 2d at 49-50 (citation omitted).

¶24    Although the circuit court correctly stated the rule that it considered whether JM Remodeling had control or the right to control Moon's work in determining whether he was a servant, the court reached its conclusions by choosing between the competing inferences in the record.  "Where the inference is clear that there is, or is not, a master and servant relationship, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered." *Thurn v. La Crosse Liquor Co.*, 258 Wis. 448, 452, 46 N.W.2d 212 (1951) (citation omitted).  We conclude this is a question for the jury because the record does not clearly support only one reasonable inference on Moon's servant status.

¶25    While the circuit court acknowledged that JM Remodeling told Moon what repairs needed to be done, the court concluded that it did not supervise his conduct and he had discretion over the work.  However, the court's characterization is choosing an inference from the record presented.  "Courts do not weigh the evidence when determining summary judgment motions." *Petzel*, 320 Wis. 2d 621, ¶9.  The record reflects that Moon testified that he supervised himself, but also that he checked in daily with Henn or the office staff for job assignments.  Henn determined the scope of the work JM Remodeling did and chose who would do it.  There is no evidence that Moon chose which jobs to work

---

[6] While the term independent contractor is defined for different legal contexts, it is often related to the statutory definition and nine-part test in the Worker's Compensation Act. *See* WIS. STAT. § 102.07(8)(b).  Here, we do not need to examine how other independent contractor statuses might apply, but instead, we examine if there are material facts at issue to determine whether Moon is JM Remodeling's servant under respondeat superior.

on or bid on projects. Although the record could support the inference that JM Remodeling did not control Moon's actions, an equally compelling inference is that Moon acted on JM Remodeling's orders and JM Remodeling had the right to control what he did.[7]

¶26 Henn and Meldman both testified that Moon was an independent contractor and never an employee. Calling a person an independent contractor is "not by itself dispositive; the test looks beyond labels to factual indicia of control or right to control." *Kerl*, 273 Wis. 2d 106, ¶24. JM Remodeling supported the view that Moon was an independent contractor with its accountant's affidavit that Moon received 1099 independent contractor tax forms in 2020 and 2021. Although Meldman testified that independent contractors were paid directly by the LLCs, not through JM Remodeling, the 1099 forms Moon received were from JM Remodeling, not from the various different buildings where Moon did maintenance work. Further, neither Henn nor Meldman denied Moon's claim that he had been paid in cash every other week, from when he started working for JM Remodeling in 2019 until the fire. Meldman, Henn, and Moon each agreed that the QuickBooks accounting report of payments to Moon looked accurate; however, the report showed no payments before May 2020, in other words, before

---

[7] We note that JM Remodeling asserts that it did not have plumbers on staff; therefore, it lacked the necessary knowledge to control Moon's actions. However, JM Remodeling also provided that Wisconsin law does not require a licensed plumber to perform a repair such as the one Moon did, including in its submissions to the circuit court a section of the City of Greenfield municipal code. *See* WIS. STAT. § 145.06(4)(d). We conclude that whether JM Remodeling had a plumber on staff is not relevant or determinative. Further, subject matter knowledge is not determinative of the right to control a servant's work. *See* RESTATEMENT (SECOND) OF AGENCY § 220 (1958) cmt. d (discussing that while the master's physical control or right to control the servant is important and often determinative, the relationship may be attenuated or dependent on customary roles, such as "the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking").

the fire, and $45,000 in payments after that. While Moon acknowledged that he did not receive a W-2 from JM Remodeling, he also stated that he did not claim the cash payments on his taxes. There is no evidence in the record of the tax treatment of the cash payments to Moon before the fire.

¶27   When we review an order granting a motion for summary judgment, our question is "not necessarily whether the inferences that have been drawn are reasonable but whether the record reveals there are competing inferences that could be considered reasonable." *Lecus v. American Mut. Ins. Co. of Boston*, 81 Wis. 2d 183, 189-90, 260 N.W.2d 241 (1977). Although the circuit court's inferences and conclusions as to JM Remodeling's control over Moon were reasonable, we also plainly see that competing inferences can be drawn from the same record. Similarly, the accounting payments and 1099 forms create competing inferences: it could be indicative of continuity, that JM Remodeling treated Moon as an independent contractor before and after the fire; or it could be indicative of change, that JM Remodeling began treating Moon as an independent contractor only after the fire. Choosing between inferences in the record is a question of fact properly for a jury. *See Thurn*, 258 Wis. at 453. "[C]redibility assessments must be made at trial and not on summary judgment." *Novell v. Migliaccio*, 2010 WI App 67, ¶12, 325 Wis. 2d 230, 783 N.W.2d 897.

¶28   Examining "the evidence, and the reasonable inferences from that evidence, in a light most favorable to the nonmoving party," we conclude that genuine issues of material fact exist on JM Remodeling's control and right to control Moon's work and whether he was acting as JM Remodeling's servant. *See Petzel*, 320 Wis. 2d 621, ¶5. Summary judgment was not appropriate. There are triable issues of fact. *See Maynard v. Port Publications, Inc.*, 98 Wis. 2d 555,

562, 297 N.W.2d 500 (1980). We therefore reverse the order dismissing Acuity's negligence claim against JM Remodeling.

## II. *Breach of contract*

¶29 Acuity asserts that, stepping into 4340 LLC's shoes, it can argue that JM Remodeling breached a contract implied in fact with 4340 LLC to perform the repair and maintenance work, and then recover for its damages against JM Remodeling, even if Moon were considered an independent contractor. JM Remodeling does not dispute that Acuity had subrogation rights arising from its insurance payment to 4340 LLC. *See **Muller v. Society Ins.***, 2008 WI 50, ¶22, 309 Wis. 2d 410, 750 N.W.2d 1. Acuity does not argue that an express contract was made between JM Remodeling and 4340 LLC, something JM Remodeling has strongly denied. Acuity argues that whether an implied contract was formed is a question for the jury; therefore, summary judgment is inappropriate.

¶30 "In evaluating a breach of contract claim, a court must determine whether a valid contract exists, whether a party has violated its terms, and whether any such violation is material such that it has resulted in damages." ***Steele v. Pacesetter Motor Cars, Inc.***, 2003 WI App 242, ¶10, 267 Wis. 2d 873, 672 N.W.2d 141. A contract implied in fact may be circumstantially proven, if by the parties' "words, their conduct, or course of dealing" it can be shown that the parties "came to a mutual agreement[.]" ***Theuerkauf v. Sutton***, 102 Wis. 2d 176, 184-86, 306 N.W.2d 651 (1981).

¶31 A "literal 'meeting of the minds' is not required" to form a contract and the "parties do not need to agree subjectively to the same interpretation at the time of contracting in order for there to be a mutual assent[.]" ***Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.***, 206 Wis. 2d 158, 180-81,

557 N.W.2d 67 (1996). "[M]utual assent is judged by an objective standard." *Id.* at 181. "[A] contract must be definite as to the parties' basic commitments and obligations" to be enforceable, and the issue of whether a contract's terms are definite may be decided by the jury, or by the court as a matter of law. *Id.* at 178; WIS JI—CIVIL 3022.[8]

¶32 If a party to an alleged contract implied in fact seeks to avoid liability, it "must come forward with evidence sufficient to rebut and overcome the presumption of the existence of an implied contract in fact[.]" *Theuerkauf*, 102 Wis. 2d at 185-86. JM Remodeling argues there is no evidence of intent to form a contract. It argues that "[u]nder Wisconsin law, if there is no intent to create a contract, then no contract should be inferred or enforced." However, it offers no legal authority for this as a rule. We decline to review issues inadequately briefed or offered without legal authority. *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶33 Acuity argues that the record shows a pattern of payments for repair and maintenance work, as circumstantial evidence to support that, by their actions and dealing, JM Remodeling and 4340 LLC came to a mutual agreement. JM Remodeling argues that even if payments for services occurred, that is not proof a contract was formed. It also argues that there were no definite terms,

---

[8] We note that under contract law, JM Remodeling may be able to delegate performance on the contract to an independent contractor, but it would not be able to delegate its liability for the performance of the contract. *Brooks v. Hayes*, 133 Wis. 2d 228, 244, 395 N.W.2d 167 (1986) ("The rule for delegation of responsibility is that if the obligor delegates the performance of an obligation, the obligor is not relieved of responsibility for fulfilling that obligation or of liability in the event of a breach."). A breach of a valid contract means that the defendant violated the contract's terms. *See Steele v. Pacesetter Motor Cars, Inc.*, 2003 WI App 242, ¶10, 267 Wis. 2d 873, 672 N.W.2d 141.

which could prevent contract formation. *See Management Computer Servs.*, 206 Wis. 2d at 178 (discussing that "indefiniteness as to an essential term of the agreement prevents the creation of an enforceable contract").

¶34 Here, we conclude that summary judgment is inappropriate because when we review the record, there are "competing inferences that could be considered reasonable." *Lecus*, 81 Wis. 2d at 189-90. The circuit court concluded there was no contract because there was no evidence of intent to form a contract; however, the court ignored whether circumstantial evidence showed through the parties' conduct and course of dealing that JM Remodeling and 4340 LLC "came to a mutual agreement[.]" *Theuerkauf*, 102 Wis. 2d at 186. Considering the evidence in the light most favorable to Acuity's claim, we conclude genuine issues of material fact exist as to whether an enforceable contract was formed. *See Petzel*, 320 Wis. 2d 621, ¶5.

¶35 While we conclude that the existence of an implied contract is a question for a trier-of-fact, we note with some concern that Acuity is not seeking a breach of contract claim, but another approach to negligence, to argue that the contract "furnishe[d] the occasion of a tort." *Colton v. Foulkes*, 259 Wis. 142, 146, 47 N.W.2d 901 (1951).[9] "[T]here must be a duty existing independently of the performance of the contract for a cause of action in tort to exist." *Landwehr v. Citizens Tr. Co.*, 110 Wis. 2d 716, 723, 329 N.W.2d 411 (1983). On remand, if an

---

[9] Acuity references the Wisconsin Supreme Court's holding that "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract." *Colton v. Foulkes*, 259 Wis. 142, 146, 47 N.W.2d 901 (1951). The Wisconsin Supreme Court has clarified that *Colton* does not authorize a tort claim from every breach of contract based solely on the contract. *Greenberg v. Stewart Title Guar. Co.*, 171 Wis. 2d 485, 495-96, 492 N.W.2d 147 (1992).

implied contract is found to have existed, then the question of whether the valid contract furnished the "state of things" for a viable tort claim would also need to be proven. *See id.*

### III. Truettner's claims

¶36 For Truettner's negligence claims against JM Remodeling, the same genuine issues of material fact preclude summary judgment. Therefore, we reverse the part of the circuit court order dismissing her negligence claim and remand it for further proceedings.

¶37 However, JM Remodeling argues that Truettner forfeited appealing the breach of contract claim by not addressing it to the circuit court prior to the second summary judgment hearing, when the court requested additional briefing. We agree. We see no reason to make an exception to our practice of not addressing issues not raised before the circuit court and raised for the first time on appeal. *See **Town of Brookfield v. City of Brookfield***, 2015 WI App 3, ¶25, 359 Wis. 2d 541, 859 N.W.2d 115. Although Truettner has joined Acuity's appeal, neither has made clear how Acuity's subrogation right under the contract claim would apply to Truettner and neither has refuted JM Remodeling's assertion that the contract claim could not be applicable to Truettner. "We take this lack of reply as a concession" that Truettner does not have a viable contract claim. ***United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

## CONCLUSION

¶38 We conclude that genuine issues of material fact preclude summary judgment on Acuity's negligence and breach of contract claims and Truettner's

negligence claim against JM Remodeling. We therefore reverse the order dismissing those claims and remand for further proceedings consistent with this decision. However, Truettner's breach of contract claim remains dismissed, and we affirm that part of the order.

*By the Court.*—Order affirmed in part; order reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.